## STATE OF CONNECTICUT *v.* MARCO CAMACHO
### (SC 16791)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued January 5—officially released May 8, 2007

*Lisa J. Steele*, special public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *John M. Massameno*, senior assistant state's attorney, and *John J. Russotto*, deputy chief state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Marco Camacho, directly appeals, pursuant to General Statutes § 51-199 (b) (3),[1] from the judgment of conviction, rendered after a jury trial, of: four counts of murder in violation of General Statutes § 53a-54a;[2] four counts of felony murder in violation of General Statutes § 53a-54c;[3] one count of

---

[1] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . [or] burglary . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

tampering with evidence in violation of General Statutes § 53a-155;[4] one count of larceny in the first degree in violation of General Statutes § 53a-122 (a) (3);[5] one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1);[6] one count of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a);[7] one count of possession of a stolen firearm in violation of General Statutes § 53a-212;[8] and one count of conspiracy to commit the crimes of murder, possession of narcotics with intent to sell, robbery in the first degree, larceny in the first degree, and tampering with evidence in violation of General

---

[4] General Statutes § 53a-155 (a) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding . . . ."

[5] General Statutes § 53a-122 (a) provides in relevant part: "A person is guilty of larceny in the first degree when he commits larceny, as defined in section 53a-119, and . . . (3) the property consists of a motor vehicle, the value of which exceeds ten thousand dollars . . . ."

Minor technical changes not relevant to this appeal, were made to § 53a-122 (a) by No. 00-103, § 1, of the 2000 Public Acts. For purposes of convenience, we refer herein to the current revision of the statute.

[6] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime . . . ."

[7] General Statutes § 21a-277 (a) provides in relevant part: "Any person who manufactures, distributes, sells . . . transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned . . . ."

[8] General Statutes § 53a-212 (a) provides: "A person is guilty of stealing a firearm when, with intent to deprive another of his firearm or to appropriate the same to himself or a third party, he wrongfully takes, obtains or withholds a firearm, as defined in subdivision (19) of section 53a-3."

Statutes §§ 53a-48 and 53a-54a (b), 21a-277 (a), 53a-134 (a) (1), 53a-122 (a) (3) and 53a-155, respectively. The jury rendered guilty verdicts on all of the charges and the defendant was sentenced to a total effective sentence of 260 years imprisonment. On appeal, the defendant raises essentially three claims. First, the defendant claims that the admission of certain hearsay statements of an unavailable coconspirator under either the coconspirator or dual inculpatory statement exception to the hearsay rule violated his federal constitutional right to confrontation. In the event that we conclude that the admission of these statements did not violate the defendant's rights under the federal constitution, he urges us to decide that the Connecticut constitution affords him more expansive confrontation rights, and that these rights were violated by the admission of these statements. Finally, the defendant claims that the prosecutor improperly appealed to the jury's emotions, mischaracterized evidence and attempted to shift the burden of proof in his closing argument, thereby depriving him of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 8:30 p.m., on September 25, 1996, a Southington police department emergency dispatcher received a 911 call from 932 Shuttle Meadow Road, the residence of Nick Votino. Responding to the call, the police discovered four persons dead from gunshot wounds in the master bedroom: Nick Votino, his daughter, Joanne Votino,[9] Lynn Suszynski and Wayne Barrows.

Police found evidence of recent cocaine use at the crime scene, and Votino, Suszynski and Barrows all tested positive for cocaine in toxicology tests per-

---

[9] Because Nick Votino has a more significant role in this case, we refer to him only by his last name where possible. We refer to Joanne Votino by her full name only.

formed in conjunction with their autopsies. Police also found crack cocaine, drug paraphernalia and a large quantity of a cutting agent used in the process of making crack cocaine.

Weeks before the murders, in the beginning of September, 1996, the defendant and Eric Henry, with whom the defendant sold drugs, were living in the Southington home of Henry's girlfriend, Raquel Martin. The three were close: Martin and Henry, who were in their late twenties, called the defendant "Son," and the defendant, who was seventeen, referred to them as "Ma" and "Pop." The defendant and Henry had been using Martin's residence as the base of operations to sell crack cocaine. Previously, the defendant had been supplying Henry with drugs to sell, and had moved into Martin's house in order to facilitate his drug dealing business. The defendant and Henry became partners, with the defendant supplying the drugs and Henry supplying protection as well as expanding the defendant's market with his own group of acquaintances. Additionally, Votino had been selling drugs for the defendant. As a result of his own drug habit, Votino had become indebted to the defendant in the amount of $400. The defendant had taken a necklace belonging to Votino as collateral on the debt.

Around the same time, Frank Brown, another drug dealer who had been supplying the defendant and Votino with drugs before Brown fled the state to escape criminal charges, was robbed of $5000. In order to recoup his loss, Brown concocted a plan regarding a 1996 Jeep Grand Cherokee, which Brown had paid for but was registered to Votino, and in Votino's possession, so that it would not be traceable to Brown. According to Brown's plan, Votino would report the Jeep stolen and the defendant would bring it to a cousin in New York who could get the Jeep "chopped" and sold. The defendant told Brown he thought he could get $10,000

to $15,000 for the Jeep, and Brown responded that the defendant could keep anything over $5000 to use for his drug business. Votino, however, did not want to cooperate with the plan.

Early in the afternoon of September 25, 1996, the day of the murders, Martin, Henry and Kathy Fusco, a neighbor with whom Henry and Martin smoked crack cocaine, went to Votino's house to try to get drugs from him. Votino gave them a small amount of drugs but explained that he could not give them any significant quantity for free because he had to sell the drugs that he had in order to pay off his debt to the defendant. Votino appeared frustrated and disappointed in being in debt to the defendant, who was significantly younger. Martin, Henry and Fusco left Votino's house around 3:30 p.m. and returned to Martin's house.

At approximately 4:30 p.m., Martin drove the defendant and Henry to Votino's house because the defendant wanted to discuss the debt that Votino owed him. Martin, who waited in the living room while the defendant, Henry and Votino spoke in the kitchen, overheard Votino say that he had $200 worth of crack cocaine left to sell, but would need more to sell in order to pay off his debt to the defendant. The defendant asked Votino to let him borrow the Jeep so that the defendant could get more drugs from a supplier, but Votino did not want the defendant to take the Jeep that night and expressed concern about getting his necklace back from the defendant. The defendant and Votino went into Votino's bedroom, and when they came out, the defendant had the Jeep keys in hand. The defendant told Votino that he would come back later that night with more drugs for Votino to sell, and warned that Votino had better be home and have sold some of the drugs he already had before the defendant returned.

Thereafter, Martin drove the defendant and Henry to the defendant's mother's house in New Britain where

the defendant picked up some clothing in a black backpack. When they returned to Martin's house, the defendant paged his drug supplier, Pedro Ramirez, and he and Henry went to meet him. The defendant purchased crack cocaine from Ramirez and told Ramirez he was about to "stick somebody up," which Ramirez took to mean that the defendant intended to rob someone.

After the defendant and Henry had returned to Martin's house, the defendant entered Martin's bedroom with a gun in a small black pouch,[10] gloves and bullets. The defendant then put the bullets in the gun, wiped down the gun and put it back into the pouch. Henry took the gun from the defendant and put it in the waistband of his pants. The defendant and Henry then left in Martin's car for Votino's house.

Approximately one-half hour after they had left Martin's house, Henry telephoned Martin from Votino's bedroom and told her that he and the defendant would be returning to her house shortly. Martin heard sounds of a party-like atmosphere and Votino's voice in the background. At the same time, unbeknownst to the defendant and Henry, Joanne Votino was in her bedroom speaking on the telephone to her boyfriend, Demond Johnson. Johnson heard four or five loud noises that he thought sounded like gunshots, followed by Joanne Votino yelling, "[w]hat's going on," and banging on the door to the master bedroom. Johnson then heard Joanne Votino scream, "[o]h my God," followed by a loud thump as she fell to the ground, as a result of being shot. Joanne Votino screamed Johnson's name and told him to call 911, which he did.

Approximately five minutes after Henry had telephoned Martin, the defendant telephoned her from what

---

[10] Martin previously had seen the defendant with the gun. The defendant had purchased the gun, which had been stolen, in June, 1996. The bullets recovered from the crime scene had been fired from the gun, which was determined to be the murder weapon.

sounded like a car, asking that she bring his black back-pack to the Shell service station near her house. Martin walked to the service station, and the defendant drove up shortly thereafter in Votino's Jeep. Martin got into the Jeep and asked the defendant where Henry and her car were. The defendant told her not to ask him or Henry any questions and drove to a house nearby where he met Ernesto Soto, an acquaintance. The defendant handed Martin his gloves and told her to hold or dispose of them, but Martin refused and handed them back to him. The defendant then tapped Martin on the right side of her back above her waist and said, "I just shot a girl right here, do you think I killed her?" Martin did not think that the defendant was serious.

The defendant asked Soto to keep the Jeep at his house and Soto used his own car to drive the defendant and Martin back to Martin's house. On the way back, the defendant and Soto discussed plans to "chop" Votino's Jeep in New York. When they arrived at Martin's house, Henry was sitting on the stairs outside her house look-ing "very nervous" and "[p]anick[ed]." The defendant, who appeared less nervous, passed the gun to Henry, who said that he would "take care of the burner."[11] The defendant asked Soto to wait to drive the defendant back to the Jeep parked at Soto's house.

While Soto waited, the defendant entered Martin's bedroom holding empty bullet casings, which he put in a plastic baggie. The defendant then told Henry that he needed to dispose of the gloves and lifted his shirt up, asking Henry to check him for evidence of the murders. The defendant then looked down, cursed and ran into the bathroom where he grabbed Martin's toothbrush and used it to scrub his pants and boots, on which Martin had noticed a dark red molasses-like substance.

---

[11] Soto testified that "burner" was a common term for a gun. Martin testified that the defendant and Henry referred to the gun as the "burner."

The defendant continued to implore Henry to check him, and Henry obliged, walking around the defendant and lifting his shirt.

Martin and Henry decided to go to a hotel to sell crack cocaine, and the defendant gave them drugs to sell. Henry embraced the defendant and said, "I love you bro, I love you bro," and the two discussed a code they would use to communicate through paging each other. Martin and Henry then left in Martin's car, and the defendant left with Soto.

After arriving at Soto's house, the defendant asked if he could come in to wash something off of his pants, and told Soto that he had gotten blood on them. Soto told the defendant he had to leave, and the defendant asked Soto to call his contact in New York about the Jeep. As the defendant left, Soto saw him take from his jacket pocket a pair of green and brown gloves. Before leaving, the defendant threw the gloves in the storm sewer.[12] The defendant subsequently took the Jeep and fled to his sister's house in the Bronx, New York, where he remained until September 27, 1996, and where the Jeep later was found by the New York state police.[13]

In the meantime, after parting ways with the defendant, Henry and Martin went to New Britain to the house of an acquaintance named Chris,[14] who had purchased drugs from Henry in the past. As they arrived, Martin realized that Henry had the gun in the waistband of his pants. When she asked Henry what he was doing with it, he told her that he was going to get rid of it. They

---

[12] One week after the incident, police recovered a pair of green gloves from a storm sewer near Soto's house. The gloves had evidence of blood on them but no gunshot residue.

[13] A witness identified Votino's 1996 Jeep Grand Cherokee as the vehicle he had seen rapidly pull out of the driveway of Votino's residence shortly after 8:30 p.m. on the night of the murders.

[14] Chris' last name could not be ascertained by a review of the transcripts in the present case.

then checked into a motel room, where Henry told Martin that he had hidden the gun in the backyard of Chris' house behind a large metal plow covered in shrubs.

Martin then went outside to use a pay telephone to call her cousin, who asked if she had heard what had happened at Votino's house. When Martin told her cousin that she had not heard anything, he told her that Votino's house had gotten "shot up." Martin then telephoned Henry's brother, who told her that people had been found dead at Votino's house. Martin became frightened, thinking about the previous events that had transpired that day, and went back into the motel room to look for the news on the television and to ask Henry what was going on. Henry appeared angry, and told her not to worry about anything. Shortly thereafter, Henry began washing his boots in the sink. Henry then made statements to Martin regarding the events at Votino's house that are contested in this appeal and will be discussed at length in part I of this opinion.

The next day, September 26, 1996, Martin and Henry spent the day at the motel, where Martin began drinking alcohol. When Martin began changing the television channels and crying, Henry told her to stop because she was "[giving] him a conscience." Henry also told her to stop drinking because he did not want her to "get brave and say something to someone . . . ." At approximately 11 p.m., after Martin and Henry had fallen asleep, the police raided the motel room and questioned them about the murders.

That night, unbeknownst to Henry, Martin led police to the gun, a Charter Arms .357 five shot revolver hidden in a pouch in the backyard of Henry's acquaintance Chris' house in New Britain, where she and Henry had gone to sell drugs after the murders. The .38 special bullets recovered from the victims and the crime scene

either were matched to or were consistent with the revolver.

Although he had fled the state, the defendant stayed in contact with a number of people in Connecticut, trying to determine how much the police knew and how to cover his tracks. He telephoned Soto several times to question him about the progress of the police investigation and told him not to say anything more to the police. The defendant telephoned his girlfriend, Jackie Rivera, on September 26, 1996, and told her that he had "got[ten] into a little trouble," stating that he had not committed the crimes, but that a "black guy" did. The defendant telephoned Ramirez, his drug supplier, to ask if the police had found the murder weapon and if so, whether they had found any fingerprints on the weapon. He told Ramirez that he had had to get rid of the Jeep and wanted to know what people were saying about the crime.

On September 27, 1996, the defendant made numerous telephone calls to Henry at Martin's residence, where Martin and Henry had returned after they had been interrogated by the police. The defendant telephoned several times, and inquired whether Henry, Martin or Martin's cousin had been talking to the police. When the defendant telephoned again later that day, he and Henry discussed disposing of the gun in the reservoir in Southington. The defendant told Henry to "stay ghost," meaning stay away, and told him to "get rid of [the gun] in [the] water." Unaware that Martin already had led police to the gun, Henry told the defendant that he would get the gun and throw it in the reservoir. Henry demanded his portion of the proceeds from "chopping" the Jeep, which he insisted were owed to him as an accomplice, and the defendant agreed to wire money to Henry.

Shortly after these conversations, Henry told Martin that he was not sure that he could trust her and that

he was "looking at someone [who could] put him in the electric chair." Martin became frightened and later was taken by police into protective custody. On Tuesday, October 1, 1996, the defendant surrendered to police at his aunt's house in Beaufort, South Carolina, where he had fled to from New York. His fingerprints were found on the driver's side window of the Jeep and on the door to the gas tank.[15] Traces of lead and barium, as well as other trace materials consistent with gunshot residue were on the center console of the Jeep.

The record reveals the following additional facts and procedural history. The defendant subsequently was charged with fifteen offenses, including four counts of murder.[16] At trial, over the defendant's objection, Martin and Fusco testified about statements that Henry had made to each of them regarding the murders. According to those statements, the defendant shot all four victims and Henry had instructed the defendant to shoot Suszynski and then Joanne Votino, after the defendant and Henry realized she was in the house, to eliminate all potential witnesses. After the trial, the jury returned a verdict of guilty on all counts. Thereafter, the trial court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of 260 years imprisonment. This direct appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim that the trial court improperly allowed Martin and Fusco to testify concerning Henry's statements regarding the murders because the statements were inadmissible hearsay and

[15] The defendant's fingerprints also were found on the storm door of Votino's home.

[16] In addition to the fourteen counts previously cited in this opinion, the defendant also was charged with a fifteenth count, commission of a class A felony with a firearm. At sentencing, the trial court combined the felony murder counts with the murder counts and vacated the fifteenth count.

violated the defendant's right to confrontation under the sixth amendment to the United States constitution.[17] The state contends that the trial court properly concluded that Henry's statements to Martin were admissible under the coconspirator exception to the hearsay rule, and that his statements to both Martin and Fusco were admissible under the dual inculpatory statement exception to the hearsay rule. The state further claims that the admission of these statements did not violate the defendant's sixth amendment rights. We agree with the state that the trial court properly admitted Henry's statements.

The following additional facts and procedural history are relevant to our resolution of these claims. Prior to the trial, the defendant filed a motion in limine requesting that the state bring to the court's attention, outside the presence of a jury, any hearsay statements made by Henry that the state intended to offer at trial. After a pretrial hearing, the trial court, *Hartmere, J.*, ruled that the issue should be raised during trial. Henry, who was charged with similar crimes in a separate proceeding, thereafter was called as a witness at the defendant's trial and invoked his fifth amendment privilege against self-incrimination. Pursuant to the state's request, the trial court, *Espinosa, J.*, made a finding that Henry was unavailable as a witness. The state then called Martin to the stand and sought to introduce Henry's statements to her regarding the events surrounding the murders at issue.

Initially, the state offered Martin's testimony of Henry's statements under the hearsay exceptions for state-

---

[17] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The sixth amendment right of confrontation is made applicable to the states through the due process clause of the fourteenth amendment. See *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

ments of a coconspirator and dual inculpatory statements. The state argued that the statements were in furtherance of the broad conspiracy to commit a variety of crimes, including murder, possession of narcotics with intent to sell, robbery, burglary and larceny with respect to the Jeep, and tampering with evidence with respect to the murders. The state asserted that Henry had required Martin's cooperation to keep the conspiracy from being exposed and to help the defendant and Henry escape detection, and, therefore, that his statement to Martin was admissible under *State* v. *Pelletier*, 209 Conn. 564, 552 A.2d 805 (1989). The state also claimed that Henry's statements satisfied the hearsay exception for dual inculpatory statements, as recognized in *State* v. *Schiappa*, 248 Conn. 132, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 45 L. Ed. 2d 129 (1999), because the statements were against the penal interests of both Henry and the defendant, thereby containing an inherent guarantee of trustworthiness, and because circumstantial evidence corroborated the account.

The trial court ruled that Henry's statements describing the murders of Votino and Barrows had not been made in furtherance of a conspiracy and did not inculpate Henry, and, therefore, were inadmissible hearsay. The court further ruled, however, that the statements in which Henry specifically inculpated himself in the crimes were admissible as dual inculpatory statements. The court noted that it would reconsider its ruling in light of any additional evidence introduced in the course of the trial.

Thereafter, Martin offered the following testimony as to what Henry had told her in accordance with the court's ruling. At some point while the shootings were taking place, one of the victims moaned and Henry told the defendant to shoot her again so that she could

not identify them later.[18] Thereafter, the defendant and Henry were surprised when someone approached from the hall, a female voice yelled, "[w]hat's going on" or "what the hell is going on," and someone banged on the bedroom door. Henry told the defendant to "go get her" because she was a witness, and Henry moved one of the victim's bodies to accommodate the defendant's exit. Later that evening, when Martin turned on the television in the motel room to look for news of the murders, Henry got angry and told her to "leave it alone." While she and Henry were at the motel, Henry repeatedly warned her not to go to the police, chastised her for crying and making him feel guilty, and told her not to "get brave and say something to someone . . . ." A few days later, Henry told Martin that she could "put him in the electric chair."

After Martin's initial testimony, the state called additional witnesses who corroborated various aspects of the state's theory of the case, connecting the defendant and Henry to the murders and other related conspiracies. The state offered Henry's statements to Fusco under the hearsay exception for dual inculpatory statements. The trial court admitted Fusco's testimony under the exception, finding that the timing of the statements, the relationship between Henry and Fusco and the corroborative evidence ensured the statements' reliability. The court further concluded that the defendant's confrontation rights would not be violated because the statements were being admitted under a recognized exception to the hearsay rule for declarations against penal interest.

Fusco then testified about a confession Henry had made to her after dinner at her house approximately one week after the homicides. Henry was animated as

___

[18] Martin did not testify as to whether Henry said that the defendant actually had shot that victim again, and an examination of the victims disclosed that each had only one gunshot wound.

he began telling the story, but eventually became tearful. He had alcohol on his breath but he did not appear to be drunk when he made the statements. Henry said that he and the defendant had gone to Votino's house with the intention of either collecting a drug debt or taking the Jeep instead. When they arrived at Votino's house, they were surprised to find that Votino had company—Barrows and Suszynski—all of whom were in Votino's bedroom smoking crack cocaine. The defendant and Votino began discussing the drug debt but Barrows interrupted them, calling the defendant a punk, which prompted the defendant to shoot Barrows and then Votino. Suszynski began screaming and Henry told the defendant to shoot her because she could identify them. After the defendant shot her, Suszynski continued to moan and Henry told the defendant to shoot her again so that she could not identify them. As the defendant and Henry were leaving, they were surprised by Joanne Votino's yelling from the hallway, as they did not know that anyone else was in the house. Henry told the defendant to shoot her because she was a witness to the crimes. The defendant complied. The defendant and Henry then telephoned Martin to bring the defendant's bag containing his clothes so that the defendant could flee.

After Fusco had testified, the state recalled Martin to the witness stand seeking to introduce the previously excluded statements that Henry had made to her regarding the events that had occurred at Votino's house before Henry directed the defendant to shoot Suszynski. The state asserted that, given the abundance of additional evidence regarding the criminal conspiracies concerning the Jeep and covering up evidence of the murders that had been elicited since Martin first had testified, her testimony was admissible under the coconspirator statement exception to the hearsay rule. Over the defendant's objection, the court allowed the

state to present further testimony from Martin under the coconspirator exception. The court found that the jury could infer from the evidence the existence of a conspiracy to steal the Jeep and convert it into cash as well as a conspiracy to conceal the murder weapon, and that Henry's statements to Martin furthered these conspiracies.

Thereafter, Martin offered the following testimony regarding Henry's statements to her. Henry confessed to her on the night of the murders while they were in the motel. Martin had been looking for news on the television and questioning Henry about what had happened earlier that night. Eventually Henry recounted the events in a boastful and proud manner, reenacting the crimes and gesturing with his hands to imitate the gun that the defendant had used while describing what had happened. Henry stated that someone had blown crack cocaine smoke in the defendant's face, and the defendant had told the person that it was okay. In Martin's experience, however, the defendant hated crack cocaine smoke and would leave the room when it was around. Henry told Martin that when the defendant reacted in this unusual way, he "knew . . . something was going to go down . . . that [the defendant] was going to do [that person]." The defendant then went into the bathroom, and Henry heard the shower running and the clicking of the gun. Henry knew at that point that something was going to happen and moved out of the way. Henry told Martin, "[y]ou should have seen our son," and described the defendant coming out of the bathroom and shooting Votino in the face or head area.[19] Henry told her that someone then had lunged at the defendant, and he reenacted the defendant's shoot-

[19] Martin and Fusco provided conflicting testimony as to whether Votino or Barrows was shot first. The forensic expert testified that it was impossible from the evidence to determine the order in which the victims were shot, except that Joanne Votino had been shot last.

ing that person somewhere around the torso. Henry said that a woman was screaming, and that the defendant then shot her. Henry and the defendant then heard someone yelling, "[w]hat's going on" from another room, surprising Henry and the defendant, and Henry told the defendant, "[g]o get her, go get her, she's a witness." Henry told Martin that he "actually had to touch a body [to] move it," and mimed stepping over an object. When one of the victims continued to moan, Henry instructed the defendant to shoot that person again to eliminate all potential witnesses against them. Henry did not tell Martin whether the defendant actually had shot that person a second time.

We turn now to the law governing the admission of hearsay statements and the legal standard we must apply in our review of the trial court's decision to admit that evidence. The law regarding out-of-court statements admitted for their truth is well settled. "An out-of-court statement offered to establish the truth of the matter asserted is hearsay. E.g., *State* v. *Dehaney*, 261 Conn. 336, 355, 803 A.2d 267 (2002). As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." *State* v. *Merriam*, 264 Conn. 617, 633, 835 A.2d 895 (2003).

"Beyond these general evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. . . . [A]lthough . . . hearsay rules and the [c]onfrontation [c]lause . . . generally [are] designed to protect similar values, [the United States Supreme Court has] . . . been careful not to equate the [c]onfrontation [c]lause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The [c]onfrontation [c]lause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hear-

say rule." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 268 Conn. 351, 361–62, 844 A.2d 191 (2004). "[T]he primary interest secured by confrontation is the right of cross-examination. *Davis* v. *Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974)." (Internal quotation marks omitted.) *State* v. *Swinton*, 268 Conn. 781, 798, 847 A.2d 921 (2004).

The United States Supreme Court traditionally had defined the standard for admissibility of hearsay evidence under the confrontation clause as allowing admission of all statements in which (1) the declarant is unavailable to testify, and (2) the statement bears "adequate indicia of reliability" or falls within a "firmly rooted hearsay exception." *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). Recently, however, the court has refined this standard, overruling *Roberts* for cases in which the state seeks to admit "testimonial" hearsay statements against a defendant. See *Crawford* v. *Washington*, 541 U.S. 36, 60–69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The *Crawford* court faulted the *Roberts* test for admitting ex parte testimonial statements "upon a mere finding of reliability," and determined that the *Roberts* standard "often fails to protect against paradigmatic confrontation violations." Id., 60. The court reasoned that, "[a]dmitting statements deemed reliable by a judge is fundamentally at odds with the right to confrontation. . . . [The confrontation clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." Id., 61. The court concluded that the reliability standard was too amorphous to protect criminal defendants, and that its "unpardonable vice . . . [was] its demonstrated capacity to admit core testimonial statements that the [c]onfrontation [c]lause plainly meant to exclude." Id., 63. Thus, the court held that *testimonial* hearsay statements may be admitted only when (1) the

declarant is unavailable to testify, and (2) the defendant has had a prior opportunity to cross-examine the declarant. Id., 68–69.

The *Crawford* court, however, was careful to distinguish between testimonial and nontestimonial hearsay statements. "Where nontestimonial hearsay is at issue, it is wholly consistent with the [f]ramers' design to afford the [s]tates flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from [c]onfrontation [c]lause scrutiny altogether." Id., 68. In other words, as we have recognized, "nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if [they] satisf[y] both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant." *State* v. *Rivera*, supra, 268 Conn. 363.

Thus, when faced with the issue of the contested admission of hearsay statements against the accused in a criminal trial, courts first must determine whether the statement is testimonial. The *Crawford* court declined to define a "comprehensive definition of 'testimonial.' " *Crawford* v. *Washington*, supra, 541 U.S. 68. It did, however, identify three central "formulations of this core class of 'testimonial' statements"; id., 51; as well as other types of statements that always fall into the testimonial category. Specifically, testimonial statements include: "[1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and] [3] statements that were made under circumstances which would lead an

objective witness reasonably to believe that the statement would be available for use at a later trial . . . . These formulations all share a common nucleus and then define the [confrontation] [c]lause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, ex parte testimony at a preliminary hearing. Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." (Citations omitted; internal quotation marks omitted.) Id., 51–52. Therefore, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id., 68.

Turning to the present case, we first must decide whether the more stringent *Crawford* test applies to the evidence at issue or whether the *Roberts* test will control. It is evident that Henry's statements to Martin and Fusco do not implicate any of the core testimonial categories identified by the court in *Crawford*. The statements are not ex parte in-court testimony or its functional equivalent; nor are they contained in formalized testimonial materials such as affidavits, depositions or prior testimony. The statements were not given during custodial examination. Despite the defendant's claims to the contrary, we do not agree that the circumstances under which the statements were made would lead an objective witness reasonably to believe that the statement would be available for use at a later trial because Henry anticipated that his statements to Fusco and Martin would be used later in the prosecution of the murders or that he used either of the women as a "conduit to the police."

With respect to Martin, Henry made the contested statements to her on the night of the murders, in the privacy of their motel room, before the police had con-

tacted them. We are not persuaded by the defendant's argument that Henry must have considered Martin to be a dishonest person based on his relationship with her, and thus presumed that she would "quickly tell police everything she knew about the homicides and the murder weapon to protect herself from charges and to protect her custody of her children." Moreover, the *Crawford* court expressly identified "statements in furtherance of a conspiracy," one of the specific exceptions relied on by the trial court in its admission of Henry's statements to Martin, as "not testimonial." *Crawford* v. *Washington*, supra, 541 U.S. 56.

With respect to Fusco, Henry confessed to her in the kitchen of her home voluntarily, without any prompting. Although he already had been questioned by police by the time he made his statements to her, he had not been arrested and the record bears no indication that Henry intended for his statement to Fusco to be used in the state's prosecution of the murders.

In light of these circumstances, we conclude that Henry's statements to Martin and Fusco do not fall within the category of ex parte testimonial statements.[20] Accordingly, the *Roberts* test remains the proper standard for determining whether admission of these statements under the coconspirator and dual inculpatory hearsay exceptions violated the defendant's sixth amendment right to confrontation. See *State* v. *Rivera*,

---

[20] Because we have determined that the statements at issue in the present case are not testimonial in nature and therefore do not fall under the auspices of *Crawford*, we decline the defendant's invitation to reconsider the viability of the dual inculpatory exception to the hearsay rule in light of *Crawford*. Any reconsideration of the viability of the dual inculpatory exception under *Crawford* would not be relevant to the issues raised in the present case, and we decline to issue an advisory opinion regarding this question. *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 419, 880 A.2d 882 (2005) ("[W]e have consistently held that we do not render advisory opinions. . . . [W]here the question presented is purely academic, we must refuse to entertain the appeal." [Internal quotation marks omitted.]).

supra, 268 Conn. 365. With these principles in mind, we address each of the defendant's evidentiary claims, deciding first whether the trial court properly applied the two recognized hearsay exceptions. See, e.g., *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 635 n.15, 904 A.2d 149 (2006) (noting that this "court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" [internal quotation marks omitted]).

## A

We begin with the defendant's challenge to the trial court's admission of Martin's testimony under the coconspirator exception to the hearsay rule.[21] The trial court found that the evidence supported the state's theory of various criminal conspiracies to: sell narcotics; steal and "chop" the Jeep and split the proceeds; kill Votino; and conceal evidence of the murders. On appeal, the defendant does not dispute seriously the trial court's finding of these various criminal conspiracies.[22] Instead, the defendant contends that Henry's state-

----

[21] Although the trial court initially admitted part of Martin's testimony under the dual inculpatory statement exception to the hearsay rule, it later permitted her full testimony under the coconspirator exception, at which time she restated some of the facts to which she previously had testified in addition to testifying to new facts. The trial court ruled that the state could ask some preliminary questions to reestablish the context from Martin's prior testimony and that Martin could testify about the entire conversation, but warned the state that it did not want to go through all of Martin's testimony again. It is unclear from the record, however, whether the trial court had concluded that all of Martin's testimony fell within the coconspirator exception, and only limited the state's questioning to avoid repetition. In any event, however, as we discuss herein, all of her testimony properly could have been admitted under the coconspirator exception. Accordingly, we analyze its admission only under this exception. See *Kelley* v. *Bonney*, 221 Conn. 549, 592, 606 A.2d 693 (1992) (noting that "[t]his court is authorized to rely upon alternative grounds supported by the record to sustain a judgment" [internal quotation marks omitted]).

[22] Although the defendant does not contest that there was a conspiracy between himself, Brown and Soto regarding the Jeep, he claims that the trial court's finding that a jury could infer the existence of a conspiracy between himself and Henry to steal and "chop" the Jeep was clearly errone-

ments to Martin had not been made in furtherance of those conspiracies. The defendant claims that Henry's statements to Martin were in fact self-serving and designed to minimize his own involvement in the crimes. The defendant also claims that Henry anticipated that Martin likely would talk to the police and therefore wanted her to "present a story favorable to him," and thus Henry "[e]xculpat[ed] himself as much as he felt plausible at [the defendant's] expense . . . ." The defendant therefore claims that the trial court abused its discretion in admitting Henry's statements under the coconspirator exception and, accordingly, violated his right to confrontation. We disagree.

Statements made in furtherance of a conspiracy constitute a firmly rooted exception to the general rule barring admission of hearsay. Section 8-3 (1) (D) of the Connecticut Code of Evidence provides that "a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy" is not excluded by the hearsay rule, regardless of the availability of the declarant coconspirator. "In order to invoke the coconspirator exception to the hearsay rule, [t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course[23] and

ous because there was no testimony that Henry was a part of that plan or an intended beneficiary of its proceeds. The defendant, however, overlooks the testimony of Martin and her cousin, who testified that they had overheard Henry demanding his portion of the profit from the sale of the Jeep from the defendant after the murders, and that Martin had helped make arrangements for the defendant to wire that money to Henry. Thus, we disagree that the trial court's ruling on the existence of a conspiracy regarding the Jeep was clearly erroneous.

[23] There was substantial evidence that the conspiracy was ongoing at the time Henry made the statements to Martin. There was testimony that the defendant had telephoned Henry numerous times after the defendant had fled the state, instructing Henry to dispose of the gun in the water and asking whether Martin or her cousin had spoken to the police. There was also testimony that Henry told the defendant to "stay ghost" and inquired about his share of the profits from the Jeep. Thus, there was an abundance of evidence in the record to suggest that the conspiracies to conceal the

in furtherance of the conspiracy. . . . The court must make its preliminary determination[s] by a fair preponderance of the evidence . . . . Moreover, the evidence will be construed in a way most favorable to sustaining the preliminary determinations of the trial court; its conclusions will not be disturbed on appeal unless found to be clearly erroneous." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 843, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). As we have noted, the trial court in this case made unchallenged findings regarding the evidence in the record supporting the existence of various conspiracies alleged by the state.

Accordingly, we now examine the "in furtherance" requirement. We have determined that, "[t]he in furtherance term implies . . . [that] the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy . . . or by prompting the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity . . . . Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be in furtherance of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives . . . . Of course, whether a particular statement is made in the course of and in furtherance of the conspiracy depends upon the nature of the statement and all of the relevant facts and circumstances under which it was made." (Internal quotation

murders and "chop" the Jeep were ongoing at the time Henry confessed to Martin.

marks omitted.) Id., 844; accord *State* v. *Peeler*, 267 Conn. 611, 628–29, 841 A.2d 181 (2004). Moreover, "[a]lthough [a] statement that merely discloses the existence of a conspiracy to a non-conspirator, that merely spills the beans, with no intention of recruiting the [nonconspirator] into the conspiracy does not further the conspiracy . . . [t]he law does not require a conspirator to ask a third party expressly to do something to further the conspiracy in order for the statement to be admissible under the coconspirator exception to the hearsay rule. . . . Instead, [t]he standard to be applied is whether some reasonable basis exists for concluding that the statement furthered the conspiracy." (Citation omitted; internal quotation marks omitted.) *State* v. *Carpenter*, supra, 275 Conn. 845. "[A] liberal standard is applied in determining whether a statement is made in furtherance of a conspiracy." Id., 846.

We note also that, "[a] conspiracy does not necessarily end with the commission of the target crime. Thus, a subsequent declaration of a conspirator may be admissible against any coconspirator . . . if the conspirators were still concerned with the concealment of their criminal conduct or their identity . . . ." (Internal quotation marks omitted.) *State* v. *Peeler*, supra, 267 Conn. 629; accord *State* v. *Booth* 250 Conn. 611, 635, 737 A.2d 404 (1999); see also *United States* v. *Medina*, 761 F.2d 12, 18 (1st Cir. 1985) ("the conspiracy continued so long as the conspirators were acting together to destroy incriminating evidence"). "The actions to conceal and dispose of the murder weapon and to escape detection for the crime reasonably may be construed as part of the original conspiracy to murder the victim and escape detection." *State* v. *Robertson*, 254 Conn. 739, 747, 760 A.2d 82 (2000).

In *State* v. *Pelletier*, supra, 209 Conn. 578, this court held that a coconspirator's statement to a third party, whose house was being used to hide stolen property

and "whose further cooperation was obviously necessary . . . helped to maintain the cohesiveness of the conspiracy thereby furthering its purpose." In *Pelletier*, the declarant coconspirator had indicated that he wanted to tell the third party about the shootings committed in the course of the conspiracy before she heard it on the news. Id., 577. This court determined that the statement was thus made in part "to lessen any emotional trauma the killings would cause [the third party]," whose cooperation was needed to conceal the crime. Id., 578.

The situation in the present case is analogous to that in *Pelletier*. Martin, whose house was the base for the ongoing conspiracy to possess and sell narcotics, had observed the defendant and Henry: leaving for and returning from Votino's house with a gun that Henry later hid; upon their return, meticulously checking themselves and scrubbing their clothes; and acting oddly and reprimanding her when she asked them questions about what had happened at Votino's house. Moreover, the defendant told Martin that he had shot a woman and asked her to dispose of his gloves, and Henry told her that he had hidden the gun in a friend's backyard. By the time Henry confessed to her, Martin had heard about the shooting at Votino's house from her cousin and was searching the television channels for news of the crime. It takes no great stretch of the imagination to infer that Henry told Martin about the murders in an attempt to secure her continued cooperation in the concealment of the crimes. Additionally, Martin testified that Henry had warned her repeatedly not to talk to the police, in further attempts to protect the ongoing conspiracy.

Additionally, these facts resemble those of *State* v. *Carpenter*, supra, 275 Conn. 842–47, wherein we approved of the trial court's decision to allow a coconspirator's son to testify, under the coconspirator excep-

tion, that his father had told him that someone wanted the victim in that case dead and that another coconspirator had hired his father to kill the victim. Id., 842. We held that the father's statement to his son "was in furtherance of the conspiracy because it reasonably [could] be viewed as the first step in gaining his son's cooperation, moral support, future assistance and guaranteed silence in the aftermath of the murder." Id., 846. As in the present case, the father initially had taken steps to prevent his son from learning about the conspiracy and only later disclosed the details of the crime to him. We reasoned that the father "probably realized that it would be difficult, if not impossible, to conceal the conspiracy from his son while the two were living together. It thus made sense to tell [the son] about the plan for the purpose of enlisting his future cooperation and support and ensuring his silence following the murder." Id., 847; see also *State* v. *Robertson*, supra, 254 Conn. 750 (reasonable to conclude that coconspirator confided in third party in order to induce continued support for and cooperation with ongoing criminal conspiracy).

We conclude that there was a reasonable basis for the trial court to conclude that Henry's statements to Martin had been made in furtherance of an ongoing criminal conspiracy. Thus, the trial court acted properly in admitting this testimony. Moreover, "it is well established that a coconspirator's [hearsay] statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause." (Internal quotation marks omitted.) *State* v. *Carpenter*, supra, 275 Conn. 843; accord *State* v. *Pelletier*, supra, 209 Conn. 577. Accordingly, the admission of Martin's testimony recounting Henry's statements to her did not violate his rights under the sixth amendment.

B

We turn now to the defendant's challenge to the trial court's admission of Fusco's testimony regarding Henry's statements to her about the crimes. The defendant claims that the trial court improperly concluded that the statements satisfied the dual inculpatory hearsay exception, and that their admission violated his sixth amendment right to confrontation.[24] We disagree.

Section 8-6 (4) of the Connecticut Code of Evidence creates an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant[25] if that statement was "trustworthy" and, "at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." Accord *State* v. *Schiappa*, supra, 248 Conn. 148–49 (construing rule 804 [b] [3] of Federal Rules of Evidence, federal analog to § 8-6 [4] of Connecticut Code of Evidence). That section further instructs that, "[i]n determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." Conn. Code Evid. § 8-6 (4); see also *State* v. *Pierre*, 277 Conn. 42, 68, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); *State* v. *Rivera*, supra, 268 Conn. 361. Additionally, this court has held that, "it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial

---

[24] We note that the defendant challenges the admission of Fusco's testimony regarding Henry's statements in its entirety. Therefore, we do not address whether any particular statement fails to satisfy the dual inculpatory exception and we address the statements in toto as do the parties.

[25] We note that neither party contests Henry's unavailability as a witness.

court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement." *State* v. *Lopez*, 254 Conn. 309, 316, 757 A.2d 542 (2000).

"A dual inculpatory statement is a statement that inculpates both the declarant and a third party, in this case the defendant." *State* v. *Schiappa*, supra, 248 Conn. 145 n.15. We evaluate dual inculpatory statements using the same criteria that we use for statements against penal interest. Id., 153. Whether a statement is against a declarant's penal interests is an objective inquiry of law, rather than a subjective analysis of the declarant's personal legal knowledge. Under § 8-6 (4), we must evaluate the statements according to a reasonable person standard, not according to an inquiry into the declarant's personal knowledge or state of mind.[26] See *State* v. *Pierre*, supra, 277 Conn. 65 (a "fair reading of the . . . statement, viewed through the lens of common sense, makes it abundantly clear that the statements attributed to [the coconspirator] subject both [the coconspirator] and the defendant to criminal liability").

As we have described, in his statements to Fusco, Henry admitted that he had instructed the defendant to kill two people. He told Fusco that he and the defendant had gone to Votino's house with the intent of taking

[26] Thus, the defendant's claims that "[t]here is no indication that Henry understood that claiming to have encouraged [the defendant to shoot Suszynski and Joanne Votino] was against his [penal] interests," and that Henry's statements were blame-shifting and intended to minimize his role in the murders, are irrelevant to our analysis. We note in addition that these claims are disingenuous in light of the fact that, in his statement to the police, Henry claimed that he was waiting in the car outside Votino's house when the defendant shot the victims, that he fled when he heard gunshots, and that the defendant threatened to kill him if he did not dispose of the gun. These statements indicate that Henry likely *did* know that instructing the defendant to shoot the victims and hiding the murder weapon would subject him to criminal liability.

the Jeep in the event Votino could not pay his drug debt. He also told her that he had helped the defendant flee after the murders. Moreover, Fusco characterized Henry's manner as he described the crimes and panto-mimed the shootings as "animated" and "cheerful," indicating his pride in the defendant's actions. In total, his statements revealed an organized and collaborative effort between himself and the defendant in the commission of various crimes. Henry's actions in commanding the defendant to shoot the victim who was still moaning and to shoot Joanne Votino because she would have been a witness were both crimes carrying serious sentences.

Henry's statements to Fusco were not blame-shifting because they exposed him to potential liability for the same crimes with which the defendant is now charged,[27] thereby implicating both himself and the defendant equally. See *State* v. *Rivera*, supra, 268 Conn. 368 (finding statement against declarant's penal interest because, even if statement was attempt to minimize his involvement in murders, it nonetheless "fully and equally implicated both [the declarant] and the defendant" in crimes with which defendant was charged); see also *State* v. *Hallum*, 585 N.W.2d 249, 255 (Iowa 1998) ("[a]lthough declarations such as 'we killed [him]' could be viewed as an attempt to share blame, they could not reasonably be seen as an attempt to *shift* blame away from [the declarant] because [such] assertions [implicate the declarant] fully and equally in the [crime]" [emphasis in original]).

Finally, several facts demonstrate that Henry understood the legal implications of his statements. Henry told Martin that she could "put him in the electric chair,"

[27] Indeed, Henry was charged with similar crimes in a separate proceeding and pleaded guilty to four counts of murder. See *State* v. *Henry*, Superior Court, judicial district of New Britain, Docket No. CR9604970460 (December 22, 2006).

repeatedly warned her not to talk to the police and questioned whether he could trust her, indicating that he reasonably understood that his statements were against his penal interest. See *State* v. *Rivera*, supra, 268 Conn. 368–69 (fact that declarant drove witness to remote location before making statement, told witness he and defendant had done something wrong and admonished witness not to repeat statement "clearly establishes" that declarant realized statement was against his penal interest). Although Henry made these statements to Martin, not Fusco, because he told both women essentially the same story, it is clear that he understood the legal ramifications of both statements. Thus, we conclude that Henry's statements to Fusco were indeed against his penal interest.

Under the trustworthiness component of our inquiry, the circumstances under which Henry made the statements strongly indicate the reliability of the statements. Henry confessed to Fusco approximately only one week after the murders. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 70; id., 70–72 (statements made within "couple of weeks" of homicide trustworthy); see also *State* v. *Rivera*, supra, 268 Conn. 370 (statements made within five months trustworthy). In addition, although Henry made his statement to Fusco after he had been questioned by the police, it was essentially the same as the one he had made to Martin immediately after the murders and before speaking to the police.

Finally, we note that the declarant's making the contested statements of his own volition, to people with whom he had a trusting relationship, as occurred in this case, is further indication of the reliability of the statements. See *State* v. *Pierre*, supra, 277 Conn. 69–70

(implication of reliability when declarant "made the statements on his own initiative, to an individual who was a friend and someone he routinely socialized with, and not in the coercive atmosphere of official interrogation" [internal quotation marks omitted]); *State* v. *Rivera*, supra, 268 Conn. 369–70 (statement made, upon witness' own initiative, "to a close family member, and not in the coercive atmosphere of official interrogation," strongly indicative of statement's reliability [internal quotation marks omitted]). Fusco was not only Henry's neighbor, but also a friend with whom he shared meals and talked about families. The fact that Henry and Fusco used drugs together also supported finding a relationship of trust.[28] Thus, Henry made these statements in a noncoercive atmosphere to a person with whom he had a close relationship. "Such statements are significantly more trustworthy than statements obtained by government agents for the purpose of creating evidence that would be useful at a future trial. . . . In short, neither facing arrest nor being under arrest when making his statements to [the witness], [the declarant] lacked the obvious incentive to shift blame or curry favor with the police. . . . Additionally, although [the witness] was not a relative of [the declarant] . . . a factor that we have previously noted when evaluating whether a statement is trustworthy, the trial court specifically found that [the witness] was far from a stranger . . . . [T]he fact remains that they shared a friendship and a relationship of trust." (Citations omitted.) *State* v. *Pierre*, supra, 70.

In light of the preceding factors, we conclude that the trial court properly admitted Henry's statements to

---

[28] As the trial court reasonably concluded: "That is reliable because you would trust someone that you're doing illegal acts with. . . . [B]ecause if you're doing drugs . . . purchasing crack cocaine, selling crack cocaine, with people, then you do establish a relationship of trust, because you figure they're not going to turn you in, because you're all doing illegal conduct. So there is a relationship of trust between [Fusco] and [Henry]."

Fusco under the dual inculpatory statement exception to the hearsay rule. We turn now to the determination of whether the admission of this statement nonetheless violated the defendant's federal constitutional right to confrontation.

"The United States Supreme Court recently has addressed the constitutional framework in which hearsay statements against penal interest may be admitted into evidence under the second prong of *Roberts*. In *Lilly* v. *Virginia*, 527 U.S. 116, 127, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), the court recognized that, due to the sweeping scope of the label, the simple categorization of a statement as a declaration against penal interest . . . defines too large a class for meaningful [c]onfrontation [c]lause analysis. . . . Hence, the court divided statements against penal interest, offered into evidence in criminal trials, into three principal categories: (1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 365–66.

Fusco's testimony regarding Henry's dual inculpatory statements offered by the state in the present case falls into the third category. "As with any statement against penal interest, the trial court must carefully weigh all of the relevant factors in determining whether the statement bears sufficient indicia of reliability to warrant its admission. . . . As we previously have stated, when viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discretion." (Citation omitted; internal quotation marks omitted.) Id., 361.

In *Lilly* v. *Virginia*, supra, 527 U.S. 136–57, the United States Supreme Court reaffirmed that dual inculpatory

statements may be admitted without violating defendants' confrontation rights under the second prong of *Ohio* v. *Roberts*, supra, 448 U.S. 66, provided that they possess "particularized guarantees of trustworthiness."[29] *Lilly* v. *Virginia*, supra, 136; see also id., 145–49 (Rehnquist, C. J., concurring); *State* v. *Rivera*, supra, 268 Conn. 367 (applying *Lilly* analysis). The *Lilly* plurality cautioned, however, that, "when deciding whether the admission of a declarant's out-of-court statement violates the [c]onfrontation [c]lause, [appellate] courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the [c]lause." *Lilly* v. *Virginia*, supra, 137. Thus, our review of whether Henry's statements were sufficiently trustworthy under the confrontation clause based solely on the circumstances surrounding the making of the statements is plenary.[30]

---

[29] In support of his argument that the admission of Henry's statements violated his right to confrontation, the defendant relies heavily on *Lilly*, specifically, the opinion of the plurality recognizing that, "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our [c]onfrontation [c]lause jurisprudence." *Lilly* v. *Virginia*, supra, 527 U.S. 134. *Lilly*, however, is factually distinguishable from the present case because it concerned a coconspirator's confession given in police custody in which the coconspirator shifted responsibility for the crimes to the defendant, rendering the confession unreliable. Id., 120–22. The court specifically noted that "the statements taken from the [codefendant] . . . [while in custody] were obviously obtained for the purpose of creating evidence that would be useful at a future trial." Id., 125; see *State* v. *Rivera*, supra, 268 Conn. 370 ("*Lilly*'s main concern was with statements in which, as is common in police station confessions, the declarant admits only what the authorities are already capable of proving against him and seeks to shift the principal blame to another [against whom the prosecutor then offers the statement at trial] . . . . *United States* v. *Shea*, 211 F.3d 658, 669 [1st Cir. 2000], cert. denied, 531 U.S. 1154, 121 S. Ct. 1101, 148 L. Ed. 2d 973 [2001]." [Internal quotation marks omitted.]).

[30] "We note that independent corroborative evidence may not be used to support a statement's particularized guarantees of trustworthiness, because reliance on such evidence gives rise to an undue risk that presumptively unreliable hearsay evidence will be admitted not on the basis of its inherent reliability but, rather, by bootstrapping on the trustworthiness of other evidence at trial . . . . In other words, evidence not directly related to the

Our independent evaluation of the facts on the record as to the circumstances discussed previously persuades us that the trial court properly admitted Henry's statements. We conclude that the trial court properly determined that the evidence was trustworthy and, accordingly, that the defendant's federal constitutional right to confrontation was not violated by the admission of Fusco's testimony.

## II

We now address the defendant's claim that the admission of Henry's statements through Martin and Fusco violated his confrontation rights under the Connecticut constitution. The defendant claims that we should conclude that the admission of "blame-shifting or dual inculpatory statements made by a coconspirator, outside the defendant's presence, under circumstances where the coconspirator anticipated the witness would repeat the statements to law enforcement in an imminent investigation" violates article first, § 8, of our constitution.[31] This claim fails, however, because it is based

circumstances surrounding the making of the statement cannot be used to substantiate the statement's trustworthiness. . . . Independent corroborative evidence may be used, nonetheless, to explain the meaning or import of an *otherwise reliable* hearsay statement." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 367 n.15.

Although independent evidence may not be used to corroborate hearsay statements in analyzing *constitutional claims*, this court has used such evidence in evaluating reliability under the state evidentiary standard. See, e.g., *State* v. *Pierre*, supra, 277 Conn. 71–72. Indeed, this court has noted that, "[a] forceful argument may be made . . . that even though a hearsay statement may be sufficiently reliable to satisfy constitutional requirements, the state nevertheless should not be permitted to use the statement against an accused unless the statement's truthfulness is adequately corroborated by other independent evidence." *State* v. *Schiappa*, supra, 248 Conn. 156 n.28. Accordingly, to the extent that the defendant claims that the trial court abused its discretion in considering corroborating evidence in its evaluation of reliability necessary under our rules of evidence, we disagree.

[31] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

on faulty factual premises, specifically that Henry's statements were blame-shifting and that he used Martin and Fusco as conduits to the police in anticipation of an imminent investigation.

As we previously have discussed in part I of this opinion, Henry's statements were not blame-shifting, but inculpatory, and exposed him to criminal liability. Moreover, there is evidence that Henry realized these statements were inculpatory because, in the statement he had given to the police on the day after the murders, he claimed to have been waiting in the car when the defendant shot the victims and to have fled when he heard gunshots. Additionally, there is no evidence in the record to support the conclusion that Henry used Martin and Fusco as conduits to the police. Indeed, as we have noted, Henry repeatedly warned Martin *not* to talk to the police, eventually leading her to seek police protection in fear for her safety. Accordingly, the defendant's claim under the state constitution must fail.

### III

We now address the defendant's claim that his federal constitutional rights were violated as a result of prosecutorial impropriety. Specifically, the defendant claims that, in his closing argument, the prosecutor: (1) mischaracterized evidence; (2) shifted the burden of proof to the defendant; and (3) appealed to the emotions, passions, and prejudices of the jurors.[32] The defendant contends that the cumulative effect of these improprieties deprived him of a fair trial. We disagree.

---

[32] In his factual summary of the case, the defendant asserts that there were various instances during the trial when the trial court rebuked the prosecutor for: (1) evoking a nickname of the defendant, "Killer," which had been excluded by a prior order; (2) not exercising "good judgment" when he told the jury that he was submitting a document with the nickname omitted; and (3) making "improper speaking objections." Because the defendant has not included any of these matters in his prosecutorial impropriety briefing, we limit our inquiry to those instances in the prosecutor's closing argument that are the subjects of the defendant's analysis.

"In examining claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 604, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007).

This court previously has acknowledged: "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the

evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from . . . the special role played by the state's attorney in a criminal trial. He is not only an officer of the court . . . but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 744–46, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); see also *State* v. *Rowe*, 279 Conn. 139, 158–59, 900 A.2d 1276 (2006); *State* v. *Colon*, 272 Conn. 106, 236–37, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

"In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial. . . . Thus, prosecutorial [impropriety] occurring in final argument may be so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact." (Citations omitted;

internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 247–48, 833 A.2d 363 (2003).

Finally, we note that the defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. In *State* v. *Stevenson*, 269 Conn. 563, 571, 849 A.2d 626 (2004), we clarified our due process analysis for claims of prosecutorial impropriety in which no objection was raised at trial. We explained that, in such cases, the defendant need not seek to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), nor must the reviewing court apply the four-pronged *Golding* test.[33] *State* v. *Stevenson*, supra, 572–73. This is because appellate review of prosecutorial misconduct claims necessitates a determination of whether the defendant was deprived of his right to a fair trial, which is evaluated through the application of the factors set out in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Specifically, we consider: "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id.

"This does not mean . . . that the absence of an objection at trial does not play a significant role in the

[33] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)

application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson,* supra, 269 Conn. 575. "[T]he fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." Id., 576. With these principles in mind, we first examine the contested statements to determine if they were improper and then determine, in the context of the entire trial, whether any improprieties deprived the defendant of his due process right to a fair trial.

A

We consider first the defendant's claim that the prosecutor mischaracterized certain evidence in his closing argument. Specifically, the defendant claims that the evidence does not support the prosecutor's statements that Suszynski tried to "climb over the bed to get away from the defendant," and that Joanne Votino saw her father's dead body. We disagree.

The evidence showed that Suszynski was sitting on the bed when she was shot and landed facedown on the mattress. The bullet entered her back, emerged from her torso, penetrated her forearm and reemerged from her wrist before lodging in her mattress. The state's forensic expert testified that Suszynski may have been crawling when she was shot. From this evidence, the

jury reasonably could have inferred that Suszynski had been making an attempt to hide behind the bed in order to escape her assailant.

Likewise, there was ample evidence introduced at trial that could have led the jury to infer that Joanne Votino saw her father's dead body. The police discovered Votino's body in front of the doorway to his bedroom. The state's forensic expert had opined that the blood evidence was consistent with Votino's head having been propped up against the door and then having been moved by the door being opened in order to allow entry into and exit from the room. There was evidence that Joanne Votino had banged on that door and that Henry had moved Votino's body, presumably so that the door could be opened to allow the defendant to shoot Joanne Votino. Joanne Votino screamed, "[o]h my God" and thereafter was shot. Finally, the state's forensic expert had testified that the blood evidence was consistent with Joanne Votino having stepped over her father's dead body to reach the telephone to make the 911 call after she was shot. Accordingly, the defendant's claim that the prosecutor mischaracterized this evidence is without merit.

## B

We next address the defendant's claim that the prosecutor attempted in his closing argument to shift the burden of proof to the defense. Specifically, the defendant objects to the prosecutor's statement in his initial closing that there were two ways in which the jury could view the evidence: either that Henry and the defendant had planned to murder Votino and steal his Jeep to sell to a chop shop, or that the defendant was the "victim of an elaborate scheme, a plot, concocted by many people in order to frame him for four murders he did not commit" and that the state's witnesses were the actual conspirators who had plotted against the

defendant. We disagree that, when viewed in context, these statements were improper.

Immediately after making this statement, the prosecutor urged the jury to consider which characterization was supported by the evidence. In the course of trial the defendant had attacked the credibility of the state's witnesses, suggesting that, inter alia: they were tailoring their testimony to receive favorable treatment on criminal charges; the state had influenced their testimony; they were drug addicts whose veracity could not be trusted; and they simply were lying. In the context of the trial and considering the factual theories proffered by the parties, we view the prosecutor's statement merely as an attempt to summarize the two theories offered at trial and to ask the jury to decide which one was best supported by the evidence. The prosecutor did *not* argue that these were the only two possible explanations for the evidence and that the jurors had to choose one or the other, that there could be no other explanation than those offered at trial.

Nor do we view the prosecutor's comments as suggesting that, in order to acquit the defendant, the jury would have to find that the state's witnesses had lied, which we previously have concluded is improper. See *State* v. *Singh*, 259 Conn. 693, 709–12, 793 A.2d 226 (2002). When viewed in the context of the trial, these statements did not amount to an improper attempt to shift the burden of proof in this case.

C

We next consider the defendant's claim that the prosecutor improperly appealed to the "emotions, passions and prejudices" of the jurors in his closing argument. On the basis of our review of these claims and in light of the entire record, we conclude that three of the contested statements were improper.

The following additional facts are relevant to our resolution of this claim. The prosecutor commented, in his initial closing remarks: "[T]his case is a case about choices, choice between good and evil, between right and wrong. . . . [A murder victim does not get the chance to put his past behind him and redeem his past errors.] Instead, all that is left are grieving relatives, clutching to the memories of the past and the thoughts of what could have been, the thoughts of [Suszynski] and [Barrows] and a bed and breakfast in New Hampshire, of Joanne [Votino] raising a family or pursuing a career, of Nick [Votino], a successful machinist, facing retirement. . . . Now, I speak of the value of human life only to underscore the importance of your job as jurors in this case, because, you see, Nick [Votino], [Barrows], [Suszynski], and Joanne [Votino] cannot speak here in this courtroom. Only their photographs are present for you to see. Their voices have been forever silenced, and so it is our job to present their cry for justice here in this courtroom. . . .

"It was clear to all of us that, despite the length of time of the case, you never lost your interest, and you never lost your commitment to this case, even though you had to devote that interest at a time of national crisis.[34] And as I said at the beginning of this case, it is altogether fitting that you should be here, in this courtroom, at this time in our nation's history, because you are here to administer the justice that our nation so reveres. And it is fitting that, while our troops are defending American values abroad, you here, at home, are defending our American values."

During a break in the prosecution's initial argument, defense counsel objected to the tenor of the prosecu-

---

[34] The trial originally was scheduled to begin on September 11, 2001, but because of the attacks on the World Trade Center and the Pentagon, it was continued until the next day. On that day, the court gave the jury the option of proceeding with the trial or postponing it until the following week, and the jury elected to proceed immediately.

tion's argument, claiming it was a "blatant attempt to . . . appeal to the emotions of the jury . . . [and talk about] why this is a case between right and wrong." The trial court told defense counsel that it would consider specific objections and curative instructions at the end of closing arguments. Before the prosecutor began his rebuttal of the defendant's closing argument, defense counsel renewed his objection to the prosecutor's appeal to the jury's emotions and asked that the court caution the prosecutor not to engage in the same type of appeal again. The court ruled that it would charge the jurors on the law with respect to appeals to emotions, admonished the prosecutor that he "did make a statement that this is a choice between good and evil, and that is not correct," and said that it would charge the jury on the fact that it was not to make its decision based on moral judgments.

In his rebuttal closing, the prosecutor played an audiotape recording of the 911 telephone call made by Joanne Votino after she had been shot, wherein she could be heard gasping for breath, unable to talk. Thereafter, the prosecutor made the following statements: "On September 25, 1996, that [eighteen] year old girl tried desperately to save her dad and couldn't. She tried to save herself and others but did not succeed. She tried to cry out for help, but her voice simply could not be heard. Well, her cry continues to this day, as does her dad's, [Barrows'] and [Suszynski's]. They're not cries to be helped anymore, for that is too late. No, now they are cries for something else. They're cries for justice.

"You know, the Bible records God's questioning in the first murderer. His name was Cain. And when God asked Cain where his brother was, Cain denied his guilt and rather callously answered, 'Am I my brother's keeper?' But God wasn't fooled and told Cain that the blood of his brother was crying forth from the ground.

"Well, so too the voices of Nick [Votino], Joanne [Votino], [Barrows] and [Suszynski]—their blood is crying forth from the ground, seeking justice, not sympathy. This is not to be a verdict based on sympathy or emotion. It's a verdict to be based on justice. . . .

"Now, ladies and gentlemen, we must look to you to bring justice not only to the grieving families but to society at large and to this defendant. We, the people of the state of Connecticut, ask you to go do justice, in the words of your oath, without respect of persons, so help you God."

Defense counsel objected vehemently to the state's argument as improperly playing on the jury's emotions and moved for a mistrial, specifically objecting to, inter alia: the replaying of the tape; the references to Cain and Abel, biblical sanctions, the voices of the dead calling out from the grave and bringing justice to the grieving; and the "so help you God" closing. The trial court ruled: "Viewing the state's remarks as a whole, the court does not feel that they rise to the level of prosecutorial misconduct requiring a mistrial. However, some of the references are troublesome to the court, and the court will instruct on them . . . ." The court then asked both parties to submit proposed curative instructions, which it incorporated into its jury instructions.

We note at the outset of our analysis that, as this court previously has recognized, "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which

are likely to skew that appraisal. . . . No trial—civil or criminal—should be decided upon the basis of the jurors' emotions." (Internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 602, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); see also *State* v. *Rizzo*, supra, 266 Conn. 255. As we have recognized, however, "[t]he burden on the defendant is to show that the prosecutor's remarks were prejudicial in light of the entire proceeding. . . . The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 703, 911 A.2d 1055 (2006). With this framework in mind, we examine whether the prosecutor inappropriately appealed to the jurors' emotions. We distinguish four categories of conduct to which the defendant objects as improper: (1) replaying the 911 audiotape; (2) references to the victims' voices crying out for justice and to their relatives left with nothing but memories; (3) references to the soldiers abroad and their patriotic duty; and (4) religious references. We consider each in turn.

1

We begin with the defendant's claim regarding the prosecutor's replaying of the audiotape of the 911 telephone call made by Joanne Votino as she was dying. Although he does not contest that the audiotape properly was admitted into evidence as an exhibit at trial, the defendant claims that the trial court abused its discretion by allowing the audiotape to be used during closing argument and that the prosecutor improperly used it to inflame the jury's sympathies for the youngest victim. The defendant appears to assert both that the trial court committed an evidentiary error in permitting the audiotape to be replayed during closing arguments

and that the prosecutor committed an impropriety in his use of the audiotape in closing argument. Regardless of how the claim is characterized, however, the defendant cannot prevail.

As we have noted previously, this audiotape was admitted as a full exhibit and played during trial. The defendant did not challenge its admission as evidence, seek a limiting instruction on its use or argue that the trial court had abused its discretion in allowing the state to play the audiotape. When the defendant moved for a mistrial at the end of the state's argument, he admitted, "[t]he [audio]tape is relevant. The [audio]tape came in admissible. But it had nothing to do with anything I said [in] my closing argument . . . ."

As a general matter, a prosecutor may use any evidence properly admitted at trial. Properly admitted evidence, however, may not be used for a purpose for which it was not admitted. Conn. Code Evid. § 1-4 (evidence admissible for one purpose but not for another is admissible for that purpose; court may restrict evidence to its proper scope); see, e.g., *State* v. *Lopez*, 280 Conn. 779, 794–95, 911 A.2d 1099 (2007) (evidence of defendant's prior crimes admissible to prove knowledge, intent, motive or common design but not to prove bad character or propensity for criminality). In this case, however, as we have noted, the audiotape was admitted as a full exhibit, and the defendant did not request a limiting instruction from the court. Accordingly, it fell within the rule as previously explained under our case law that, "[a]n exhibit offered and received as a full exhibit is in the case for all purposes." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole*, 189 Conn. 518, 525, 457 A.2d 656 (1983).

Although this court has not addressed the use of audiotapes during closing arguments,[35] it has addressed

[35] We note, however, that other courts have rejected claims that playing 911 audiotapes previously admitted as trial exhibits during closing arguments

the use of visual aids. In regard to such aids, we have held, "counsel is entitled to considerable leeway in deciding how best to highlight or to underscore the facts, and the reasonable inferences to be drawn therefrom, for which there is adequate support in the record. We therefore never have categorically barred counsel's use of such rhetorical devices, be they linguistic or in the form of visual aids, as long as there is no reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party. Indeed, to our knowledge, no court has erected a per se bar to the use of visual aids by counsel during closing arguments. On the contrary, the use of such aids is a matter entrusted to the sound discretion of the trial court." *State* v. *Ancona*, supra, 270 Conn. 598; accord *State* v. *Skakel*, supra, 276 Conn. 767 (upholding state's use, during closing argument, of audiovisual montage of evidence admitted at trial).

We do not view the prosecutor's use of the audiotape in this case, reflecting Joanne Votino's attempt to get help, as rising to the level of flagrant misuse of evidence properly admitted at trial. See, e.g., *State* v. *Rizzo*, supra, 266 Conn. 257–58 (showing slides of victim's autopsy photographs and referring to them as victim's "family album" constituted improper appeal to emotions of jury and "[could not] be defended as mere rhetorical flourish" [internal quotation marks omitted]). Nor has the defendant cited any legal precedent that would justify

was improper. See *State* v. *Bridgewater*, 823 So. 2d 877, 903–904 (La. 2002) (playing 911 audiotape for third time during closing within proper scope of argument because audiotape was admitted as full exhibit), cert. denied, 537 U.S. 1227, 123 S. Ct. 1266, 154 L. Ed. 2d 1089 (2003); *State* v. *Shuler*, 353 S.C. 176, 186, 577 S.E.2d 438 (2003) (playing portion of 911 audiotape and entire audiotape during closing not denial of due process). The defendant fails to explain or to cite any legal precedent that would justify the conclusion that the trial court's failure to preclude the prosecutor from using a full exhibit during his closing argument constituted a constitutional violation that deprived him of a fair trial.

the conclusion that the trial court's failure to preclude, sua sponte, the prosecutor from using a full exhibit during his closing argument deprived the defendant of a fair trial. Undoubtedly, the audiotape had great dramatic effect, but it had been admitted as a full exhibit by the trial court, and the prosecutor's use of it during closing arguments for a proper purpose[36] was within his discretion in arguing his case. Thus, we cannot conclude that the prosecutor acted improperly in this instance.

## 2

We next address the prosecutor's references to the voices of the victims crying out for justice and to their grieving relatives clutching memories of the past. While we recognize that, "not every use of rhetorical language or device is improper . . . [and] [t]he occasional use of rhetorical devices is simply fair argument"; (internal quotation marks omitted) *State* v. *Warholic*, 278 Conn. 354, 366, 897 A.2d 569 (2006); these statements exceed the bounds of forceful argument and cross the line into impropriety. These statements had nothing to do with the evidence in the case or the defendant's guilt or innocence. We can conceive of no use for these statements other than to appeal to the emotions of the jurors, which is undeniably improper. "When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266

---

[36] We note, however, that, had the prosecutor played the audiotape *merely* as a segue to his improper references to the voices of the dead crying out for justice, thereby appealing to emotions and encouraging the jurors to base their decisions on something other than the facts in evidence, we would condemn this use of the audiotape; see part III C 2 of this opinion; but we conclude for the reasons discussed in part III D of this opinion, that the audiotape, along with the other improprieties, did not so prejudice the defendant as to render the entire trial unfair or the verdict untrustworthy.

Conn. 255. Thus, we agree with the defendant that the prosecutor's use of these references constituted an improper appeal to the emotions of the jurors.

3

We next address the prosecutor's references to the "time of national crisis" and its comparison of the troops "defending American values abroad" to the jury's defending American values at the trial. In our view, these remarks were improper because they were unrelated to the facts of the case and could have encouraged the jurors to base their decisions on something other than the facts in evidence. See *Viereck* v. *United States*, 318 U.S. 236, 247–48, 63 S. Ct. 561, 87 L. Ed. 734 (1943) (concluding that prosecutor's discussion in closing of war and assertion that American people were relying on jury to protect them as much as troops fighting war was "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice . . . [a]t a time when passion and prejudice are heightened by emotions stirred by our participation in a . . . war"). In examining these comments in the context of the entire trial, it cannot be overlooked that they were made closely following events that cause a heightened sense of fear in the public and a concomitant desire to support governmental action perceived as protective of the public.

The state argues that, given the fact that the trial had been scheduled to commence on September 11, 2001, "the comment was neither gratuitous, nor wholly unconnected to the case." We do not agree. The prosecutor easily could have thanked the jurors for their service without invoking the " 'time of national crisis' " or referring to "the troops defending American values abroad . . . ." The fact that the jurors might have perceived a connection between their civil duty and the events following September 11, should have been incen-

tive for the prosecutor to exercise care in his closing arguments, not an invitation to exploit the feelings engendered by that event. These references were unrelated to the facts introduced at trial and could have no other use than to inflame the patriotism of the jurors, which has no place in the deliberation process.

4

Finally, we address the defendant's claim that the prosecutor's use of religious references during its closing argument was improper. The defendant claims that the prosecutor's references to the biblical story of Cain and Abel and to the choice between good and evil were inflammatory. We agree.

In *State* v. *Ceballos*, 266 Conn. 364, 383, 832 A.2d 14 (2003), this court first addressed the use of religious references in prosecutors' arguments. After a thorough review of the law in other jurisdictions and academic commentary addressing this issue, we determined that, "courts overwhelmingly have taken a disapproving approach to the prosecutorial use of religious imagery and references during trials"; id., 384; and adopted a similar stance, but declined to adopt a per se rule and elected to retain the well settled standard under which we evaluate all claims of prosecutorial impropriety whereby the "threshold inquiry . . . to be performed . . . [is] whether the challenged statements pass the threshold of impropriety in that they are inflammatory, unduly evoke the passions or prejudices of the jurors, or improperly invade the province of the jury." Id., 389.

Turning to the comments at issue in the present case, we note that, as in *Ceballos*, the "statements made by the state's attorney during his summation not only directly invoke religious characters . . . but also impliedly reference notions of divine punishment for worldly transgressions." Id., 383. These remarks had no bearing on any of the facts adduced at trial, nor did they implicate

the jury's determination of guilt or innocence. Rather, the context of the statements, the manner in which they were delivered, and their substance constituted an inappropriate appeal to the emotions and an invasion of the province of the jurors. We note, finally, that, although we recognized in *Ceballos* that there may be instances in which prosecutors would have to make religious references in the course of discussing evidence presented at trial, "[w]e strongly caution[ed] counsel . . . against making unnecessary religious references during trial." Id., 389 n.36. We reiterate that warning today.

D

Having concluded that the prosecutor overstepped the bounds of proper argument with his references to religion, comparison of the jury's duty to that of the American troops fighting abroad, and references to the victims' voices crying out for justice and to the victims' grieving relatives, we must now ascertain "whether the trial as a whole was fundamentally unfair and . . . the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 723. In order to make this determination, we consider the factors that we have stated previously, specifically: the extent to which the impropriety was invited by the defendant's conduct or argument, the severity of the impropriety, the frequency of the impropriety, the centrality of the impropriety to the critical issues in the case, the strength of the curative measures adopted and the strength of the state's case. Id. Upon consideration of these factors, we conclude that only one factor weighs in favor of the defendant, and on balance we do not believe that he was denied a fair trial by the improprieties we have discussed.

We do not discern any conduct by the defendant as having invited these improper appeals to the emotions

of the jurors. Thus, this factor weighs in favor of the defendant. These few instances of impropriety, occurring only in closing arguments, where we typically allow some latitude, represented a small portion of closing arguments. See *State* v. *Ancona*, supra, 270 Conn. 612 (no due process violation when improper comments made in state's closing and rebuttal arguments were "isolated and sporadic rather than frequent and pervasive"). Although the prosecutor undeniably crossed the line with his religious pedagogy and evocation of the victims' blood crying out for justice, we do not believe that these rhetorical devices so prejudiced the defendant as to render the entire trial unfair or the verdict untrustworthy. We do not view these statements as "grossly egregious . . . [and] severe enough to mandate reversal." *State* v. *Thompson*, 266 Conn. 440, 480, 832 A.2d 626 (2003). Thus, the second and third factors weigh in favor of the state. Additionally, these statements were unrelated to the critical issues in the case. Indeed, the absence of a connection to any evidentiary matter in the case led to our conclusion that they were improper.

The decisive factors in this case are the final two. The state's case was strong. The defendant admitted that he had shot a woman; there was evidence connecting him to the murder weapon; witnesses testified that they had seen the defendant scrubbing his clothes and boots immediately after the murders; and he fled soon thereafter. There was evidence that he was at Votino's house during the murders, and motive evidence regarding the drug debt and the conspiracy to steal Votino's Jeep. Numerous statements by Henry, the defendant's coconspirator, detailed how the defendant had executed four people. The defendant's fingerprints were found on the Jeep, along with gunshot residue. The defendant also demonstrated consciousness of guilt when he fled the state on the night of the murders.

Finally, the state called several witnesses to prove the existence of a conspiracy between the defendant and Henry to commit these crimes and to conceal them afterward.

Finally, we note that the trial court gave a pointed and detailed curative instruction, which expressly addressed each of the improprieties we have discussed today.[37] In addition, in its final charge, the trial court instructed the jurors that the arguments of the attorneys were not evidence, that the attorneys were not witnesses, and that the jury should not consider as evidence the recollections of the attorneys or their personal beliefs about the facts of the case or credibility of witnesses.

---

[37] The court charged the jury in relevant part: "You should not be swayed or influenced by any sympathy or prejudice for or against anyone, the state, the accused, the victim[s], their families, or anyone else. . . .

"[Y]ou must set aside any feelings that you might have about the nature of the case, the defendant, the victims' famil[ies], the judge, or anyone else and decide this case only on the evidence presented in this courtroom and nothing else. . . .

"[D]uring closing arguments the prosecutor made some remarks, which I instruct you to disregard. The essence of these remarks with weeping relatives clutching to memories of the past or of what might have been in the victims' future; that the victims cannot speak in the courtroom because their words have been forever silenced, and that the prosecution must present their cries for justice; comparing your task to that of our service men abroad, who are responding to our national tragedy of September 11; that the voices of the dead are calling from the grave for justice; that the victims' voices are crying from the ground asking for justice; biblical references specifically to Cain and Abel; repeated use of the word slaughtered to refer to the murders; and references to choices between good and evil and right and wrong. You must not allow any of these references to play any part in your ultimate decision of this case.

"I want to emphasize to you that you are not here to make moral judgments about the defendant, the victims or anyone else. This is not a case about good versus evil or about religious principles. You are not here to decide whether the defendant is a good person or a bad person. You are here only to decide whether or not the defendant is guilty or not guilty, based on the evidence presented . . . by the state here, in this courtroom, and nothing else.

"[W]e have previously recognized that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant. . . . Moreover, [i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 401. In addition, we note that the defendant, in listing his exceptions to the jury charge, did not express concern about the clarity or extent of the instructions regarding any of the improprieties raised in this appeal. We conclude, therefore, that the thoroughness of the trial court's instructions, in addition to the other *Williams* factors, were sufficient to cure any potential harm caused by the prosecutor's improper closing arguments. Accordingly, the defendant was not deprived of his due process right to a fair trial.[38]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[38] We also decline the defendant's suggestion that we invoke our supervisory authority to reverse his conviction. As we previously have described, "we may invoke our inherent supervisory authority in cases in which prosecutorial [impropriety] is not so egregious as to implicate the defendant's . . . right to a fair trial . . . [but] when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . We have cautioned, however, that [s]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal. . . . Accordingly, in cases in which prosecutorial misconduct does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial misconduct in the future." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 422–23, 844 A.2d 810 (2004). In the present case, we do not view the prosecutor's conduct as necessitating this draconian remedy.