STATE OF CONNECTICUT *v.* ERNEST GARLINGTON
(AC 29976)

Harper, Robinson and Lavery, Js.

Argued November 19, 2009—officially released July 6, 2010

*Bruce D. Levin,* pro hac vice, with whom were *Lori Leavitt* and, on the brief, *Neil S. Tassel,* pro hac vice, and *Jeffrey A. Denner,* pro hac vice, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom were *Russell C. Zentner,* senior assistant state's attorney, and, on the brief, *Timothy J. Liston,* state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Ernest Garlington, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-59 (a) (1), two counts of inciting injury to a person in violation of General Statutes § 53a-179a (a), assault in the second degree as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-60 (a) (2), and conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a). The defendant claims that (1) the trial court improperly denied his motion to sever the charges related to his involvement in an assault against the victim, Derek S. Hopson,[1] from the charges related to his involvement in the attempt

---

[1] Specifically, the charges the defendant sought to sever were conspiracy to commit assault in the first degree in violation of §§ 53a-48 (a) and 53a-59 (a) (1), one count of inciting injury to a person in violation of § 53a-179a (a), and assault in the second degree as an accessory in violation of §§ 53a-8 (a) and 53a-60 (a) (2).

to commit murder of Hopson;[2] (2) the prosecutor committed prosecutorial impropriety by suppressing exculpatory evidence; (3) the court improperly admitted the hearsay testimony of a coconspirator; (4) the evidence was insufficient to sustain the verdict of the jury; (5) the court improperly denied his motion for disqualification of the trial judge and request for a new trial; and (6) he suffered from ineffective assistance of counsel. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1985, Hopson married Darlene Powell, who, having since married the defendant, had taken the defendant's surname and was named Darlene Garlington as of the time of trial. Darlene introduced Hopson to the defendant in 1995. At the time, Darlene and Hopson were still married, and the defendant was Darlene's supervisor at work. Darlene and Hopson began to socialize frequently with the defendant, and their children began referring to the defendant as "Uncle Ernie." Some time in either 1999 or 2000, the marriage of Hopson and Darlene began to deteriorate. At about this time, Hopson became suspicious that Darlene was having an affair with the defendant. Eventually, Darlene, along with the two children she and Hopson had together, moved out of the residence that she and Hopson shared to live with the defendant. Hopson and Darlene divorced in October, 2001.

Hopson's relationship with Darlene became increasingly strained following their divorce, and they began to have conflicts regarding visitation with the children. On November 2, 2001, the defendant told Hopson that he wanted to speak with him. Hopson agreed, and the defendant went to Hopson's residence. When the defendant arrived, he physically attacked Hopson and choked

---

[2] Specifically, the charges relating to the attempt to commit murder were conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a), and one count of inciting injury to a person in violation of § 53a-179a (a).

him. The defendant and Hopson struggled until, finally, the defendant relented. The defendant then told Hopson that he was going to "show [him] for messing with [his] woman." The defendant also told Hopson that he could have him seriously hurt or killed. Eventually, the defendant left.

The defendant's aggressive behavior toward Hopson continued. In February, 2002, Hopson's daughter asked him to deliver a computer game to her that she had left at his residence. After Hopson delivered the computer game, the defendant, using a car, pursued Hopson, who was also driving a car. When Hopson entered the highway, the defendant tailgated him in a menacing fashion before driving off an exit ramp. Eventually, the defendant told Hopson that he would need to arrange visits with his children through the defendant instead of Darlene.

In July, 2002, the defendant hired Willie Foote and Marvin Nowell, who were childhood friends of the defendant's, to assault Hopson. Several days later, the defendant took Foote to reconnoiter locations at which to assault Hopson. During this trip, they were accompanied by a man named Torrance Battle. Battle was a childhood friend of Foote's and was also acquainted with the defendant. At some point after that, Foote recruited a man named Jesus "Junior" Nolasco also to participate in the assault. Foote, occasionally accompanied by Nowell and Nolasco, made several other trips to reconnoiter locations at which to carry out the assault on Hopson and also to learn Hopson's patterns of travel and routines. On August 12, 2002, Foote, Nowell and Nolasco drove to Hopson's place of work. After they arrived, Nowell and Nolasco exited the vehicle. Nowell was equipped with a golf club, and Nolasco carried a can of Mace. When Hopson arrived at work, Nowell and Nolasco attacked him in the parking lot.

Nolasco sprayed Mace in Hopson's face. While Hopson's eyes were closed, Nowell struck Hopson several times with the golf club. When a nearby witness screamed, Nowell and Nolasco returned to the vehicle, and Foote drove the trio away from the scene of the assault.

Hopson was treated at a hospital and released the same day. That night, Hopson, accompanied by his future wife, Flora Allen-Hopson, went to pick up his children in the parking lot of a mall. Although Darlene was supposed to drop the children off, the defendant appeared instead. The defendant approached Hopson's vehicle and began shouting and menacing Hopson and Allen-Hopson. In response, Hopson called 911. The defendant, however, disappeared before the police arrived, and Hopson declined to press charges.

The next day, the defendant visited Foote at his residence. When the defendant arrived, Torrance Battle was also present. The defendant offered to pay Foote and Battle to kill Hopson. Foote and Battle accepted the offer made by the defendant, agreeing to kill Hopson. Foote and Battle were to be paid $15,000 up front and $30,000 after Hopson was killed. At some point thereafter, the defendant took Foote and Battle to reconnoiter locations at which to carry out the next attack on Hopson.

Foote, however, never intended to go along with the defendant's plan to kill Hopson. The defendant had not paid Foote for his participation in the August, 2002 assault because he believed that Hopson was not hurt badly enough. As retribution, Foote intended to take the money that the defendant was going to pay him up front without going through with the murder. Battle, however, remained actively involved in the conspiracy. At some point, a man named Robert Santos was also engaged to participate in the attempted murder.

On May 21, 2003, Santos attempted to kill Hopson. Hopson was leaving his place of work, accompanied by his secretary, Christine Brown. Brown accompanied Hopson because, following the August, 2002 assault, their supervisor had implemented a policy prohibiting employees from leaving work alone. Brown found her car first, got in and drove alongside Hopson as he walked to his car. As Hopson was walking, Santos entered the parking lot on foot. Santos yelled to Hopson and asked if he had any change. When Hopson said, "no," Santos asked for change again. Hopson, having never before seen Santos and feeling "in the gut level that something was not right," used a key remote to open the door to his car. At this point, Santos rushed toward Hopson, who started waving an umbrella that he was carrying in an effort to "deflect" Santos. Hopson was able to get into his car and locked the door. Santos then brandished a gun and fired a bullet that penetrated the driver's side door window of the car, hitting Hopson's briefcase. After the gunshot was fired, Hopson sounded his automobile's horn and Santos ran away.

Police responded and apprehended Santos less than one mile from the scene of the shooting. That night, Battle went to the house of Foote's parents. According to Foote, Battle appeared to be edgy and scared. Battle told Foote that he had taken Santos to "get the doctor" and was afraid that Santos would talk to the police. Battle asked Foote to contact the defendant to get money so that he could "leave town." Foote declined to help Battle, who then left. Additional facts will be set forth as necessary.

I

The defendant claims that the court improperly denied his motion to sever the charges that were related to his involvement in the August 12, 2002 assault on Hopson, from the charges that were related to his

involvement in the May 21, 2003 attempted murder of Hopson. We disagree.

The following facts and procedural history are relevant to our resolution of the defendant's claim. By information filed October 2, 2007, the state charged the defendant with conspiracy to commit assault in the first degree, inciting injury to a person and assault in the second degree as an accessory. All three of these charges were in connection with the August, 2002 assault on Hopson. The state also charged the defendant with conspiracy to commit murder and another count of inciting injury to a person. These two charges were in connection with the May, 2003 attempted murder of Hopson. On October 10, 2007, the defendant filed a motion to sever. The defendant argued that trying him at the same time for offenses related to both incidents, the August, 2002 assault and the May, 2003 attempted murder, substantially would prejudice him and deprive him of his rights to a fair trial, to confront his accusers and to due process of law. The defendant also argued that, if there were separate trials for each offense, he might want to testify and to present a defense in one case but not the other. The court did not order the charges to be severed, and the trial proceeded on all counts. The defendant, through his counsel, renewed his motion to sever after the state rested its case. In an oral ruling, the court denied the defendant's motion. On appeal, the defendant challenges the court's failure to order severance.

We begin by setting forth our standard of review. "The decision of whether to order severance of cases joined for trial is within the discretion of the trial court, and the exercise of that discretion [may] not be disturbed unless it has been manifestly abused. . . . It is the defendant's burden on appeal to show that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative

power of the court's instructions." (Internal quotation marks omitted.) *State* v. *Ancona,* 256 Conn. 214, 218, 772 A.2d 571 (2001). "In [*State* v. *Boscarino,* 204 Conn. 714, 720–25, 529 A.2d 1260 (1987)], we set forth a three part test by which to determine whether joinder of these . . . separate incidents was proper: (1) the . . . cases must involve discrete scenarios, easily separated by the jurors into . . . distinct events; (2) the crimes charged must not be of such a brutal or violent nature that the facts of one would necessarily prejudice the jury as to the others; and (3) the trial must not be so complex or lengthy that the jury would weigh the evidence against the defendant cumulatively instead of considering independently the evidence related to each separate incident." Id. "If any or all of [the *Boscarino*] factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Davis,* 286 Conn. 17, 29, 942 A.2d 373 (2008). Our analysis of the first two *Boscarino* factors does not support the claim that severance was necessary in this case. We agree with the defendant that the third *Boscarino* factor may have been implicated; however, we conclude that the court's jury instructions cured any prejudice that might have occurred.

In regard to the first prong of the *Boscarino* test, the defendant argues that "the two alleged conspiracies, while involving conduct separated by roughly six months, are not 'discrete, easily distinguishable factual scenarios.' " We disagree. The incidents, though intrinsically related, involved discrete events that easily could remain distinct in the jurors' minds. The first incident involved two assailants, Nowell and Nolasco, who used a golf club and a can of Mace to attack Hopson. The second incident involved only one assailant, Santos, who tried to kill Hopson using a gun.

In regard to the second prong of the *Boscarino* test, the defendant argues that the two incidents, being of a violent nature, "clearly implicate the concern expressed by the Supreme Court in *Boscarino* that cumulative evidence of violent or brutal criminal conduct could inflame the jury's passion and unfairly prejudice it against the defendant." We disagree. The fact that violence or brutal conduct was involved in one or both of the incidents joined for trial is not dispositive as to whether or not the facts of one incident necessarily would prejudice the jury as to the facts of the other incident. "Whether one or more offenses involve brutal or shocking conduct likely to arouse the passions of the jurors must be ascertained *by comparing* the relative levels of violence used to perpetrate the offenses charged in each information." (Emphasis added.) *State* v. *Davis*, supra, 286 Conn. 29–30. "[W]hen both crimes can be characterized as violent, the test becomes whether the facts of one are so brutal or shocking as' to amount to prejudice if tried together." (Internal quotation marks omitted.) *State* v. *Stevenson*, 43 Conn. App. 680, 690, 686 A.2d 500 (1996), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997). In the present case, both incidents were undoubtedly violent but were not particularly brutal. Hopson received only superficial wounds in the first incident and did not require a lengthy hospitalization. In fact, he was well enough to pick up his children that same evening. It does not appear that Hopson was even injured in the second incident, as the bullet fired by Santos only struck Hopson's briefcase. In sum, the facts of neither incident were so brutal or shocking so as to amount to being prejudicial to the defendant if tried together.

In regard to the third prong, the defendant claims that trying him for both incidents in the same trial "presented the obvious and palpable risk that the jury would believe that with so much smoke surrounding

the defendant, he must have had something to do with starting the fire." The defendant also argues that there was a risk of "evidentiary spillover," in that the jury might use the evidence from both cases cumulatively to conclude that if the defendant was guilty as to one, he must be guilty as to the other. Indeed, it is true that "when incidents are factually similar, there is an inherent danger that a jury might use evidence of one crime to find a defendant guilty of the others." *State* v. *David P.*, 70 Conn. App. 462, 469, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002). It is also true, however, that "[w]here evidence of one incident *can* be admitted at the trial of the other, separate trials would provide the defendant no significant benefit"; (emphasis in original) *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987); and the risk to the defendant of being convicted on cumulative evidence is nullified. "[E]vidence tending to prove prior criminal conduct which is relevant and material to an element of the crime, identity, malice, motive, or which shows a pattern of criminal activity is admissible if the trial court determines, in the exercise of its sound discretion, that its probative value outweighs its prejudicial impact." (Internal quotation marks omitted.) *State* v. *David P.*, supra, 469–70.

We are unconvinced that evidence of the crimes in either of the two incidents at issue would not have been admissible in a trial of the crimes in the other incident. In any event, the trial court advised the jurors that although they were to "separately consider each charge and consider separately the charges as they relate to the two different incidents," should they determine it "credible to do so," they could consider the evidence of one in the case of the other "on the issue of motive and common scheme or plan." "Unless there is evidence to the contrary, the jury is presumed to follow the

court's instructions." (Internal quotation marks omitted.) *State* v. *Ancona*, supra, 256 Conn. 219. The defendant has presented no evidence that the jury did not follow the court's instructions. Thus, even if the defendant's assertion that evidence of one set of crimes would not have been admissible in a trial of the other set of crimes, we conclude that the court's jury instructions cured any potential prejudice that would have resulted. Accordingly, having considered the *Boscarino* factors, we conclude that the court did not abuse its discretion by failing to sever the charges for trial.

II

The defendant next claims that the prosecutor committed prosecutorial impropriety by suppressing exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We disagree.

The following additional facts and procedural history are relevant to our resolution of the defendant's claim. Michelle Delgado, a coworker of Hopson's at the time, testified at trial that she witnessed the August, 2002 assault on Hopson. Delgado testified that she saw two men attack Hopson using a can of Mace and a golf club. Delgado testified that one of the assailants "was tall and maybe about five-nine, five-ten, dark skin, black male. The other was shorter, light skin, could have been Hispanic." Delgado testified that, approximately two years after the attack, police officers visited her. At trial, during a discussion about this meeting, the following colloquy took place between the prosecutor and Delgado about a photographic array that she claimed that the police had shown her:

"Q. I think I heard you say—correct me if I'm wrong. I think I heard you say two sets of photos. Did I hear you say that?

"A. Two pages.

"Q. And there were a bunch of photos on each?

"A. Yes.

"Q. And did you sign—you were able to recognize them?

"A. I recognized two people. They didn't tell me if they were the correct people or not. I, to this day, do not know, but I do not remember signing anything.

"Q. Or even the photos or a place on the sheet?

"A. No. I believe they marked below the photo that I chose, but I do not remember signing anything."

Following Delgado's testimony, defense counsel requested that the state produce the photographic arrays that Delgado claimed she was shown by the police. The prosecutor agreed to try and locate them. The state, however, was unable to locate any photographic arrays, and they were never produced. Nolasco and Nowell both testified for the state and admitted their involvement in the August, 2002 attack. The defendant's trial counsel argued that the photographic array *might* show that Delgado identified persons other than Nolasco and Nowell. Defense counsel argued that if such were the case, the photographic array could have been used to impeach the credibility of Nolasco and Nowell. The defendant's trial counsel thereby moved either to strike the testimony of Nolasco and Nowell, or, in the alternative, for a mistrial. The court denied both requests.

On appeal, the defendant claims that by failing to produce the photographic array, the prosecutor suppressed exculpatory evidence in violation of *Brady* v. *Maryland*, supra, 373 U.S. 87. "In [*Brady*], the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . .

violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 452, 758 A.2d 824 (2000).

In order to obtain relief under *Brady*, a defendant bears the heavy burden of satisfying *all* three prongs of the aforementioned test. See, e.g., *State* v. *McIntyre*, 242 Conn. 318, 323, 699 A.2d 911 (1997). Even if a defendant is able to demonstrate that the government suppressed *favorable* evidence, he must still demonstrate that the evidence is *material*. The test for materiality is well established. Undisclosed exculpatory evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State* v. *Wilcox*, supra, 254 Conn. 453–54. Accordingly, we "concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict." Id.

On appeal, the defendant apparently has opted to pursue a different theory regarding the significance of the photographic array than that which was argued by his trial counsel. The defendant, in his brief submitted to this court, argues that "it would have been helpful to the defendant if the nonproduced array contradicted either the identification testimony of Delgado or other identification testimony. Moreover, if such an identification never occurred—and the state failed to produce the array or to provide a plausible explanation for its

absence—the impeachment value of Delgado's having testified to an event that may not have occurred is immense."

The defendant has failed utterly to establish that the missing photographic array was either favorable or material, and, therefore, his claim under *Brady* must fail. To put it another way, the defendant has failed to establish the exculpatory nature of the allegedly suppressed evidence. The defendant argues that the photographic array *may* have been used for impeachment purposes. The defendant's argument, however, is purely speculative and without any support whatsoever because the state was unable to locate the array. The defendant is unable to point to any evidence that the photographic array would have contradicted either the testimony of Delgado or any other witness. Moreover, the defendant provides no analysis as to how or why the outcome of the trial would have been different had the photographic array been produced. Because the defendant has failed to establish the materiality of the photographic array, we conclude that his suppression of exculpatory evidence claim must fail.

### III

The defendant claims that the court improperly allowed Foote to testify as to out-of-court statements made by Battle. The defendant claims that Battle's statements were inadmissible hearsay. Specifically, the defendant claims that these statements did not fall within any exception to the hearsay rule and violated his sixth amendment right to confront witnesses.[3] We

---

[3] Curiously, the defendant also claims, because "[t]he dual inculpatory exception requires inculpation," that "[a]s far as the second attack is concerned, Foote simply did not inculpate himself. Thus, a crucial linchpin of the reliability on which the dual inculpatory hearsay exception is based is missing. As such the state may not avail itself of this hearsay exception." We fail to see the logic of the defendant's argument because Foote testified at the trial, and, as far as we are able to discern, neither the defendant nor his trial counsel objected to the admission of any out-of-court statements made by Foote. Moreover, if the defendant is attempting to somehow assert

disagree. The court properly ruled that Battle's statements to Foote were admissible under the coconspirator exception to the hearsay rule. Moreover, because an out-of-court statement that is made by a declarant who is unable to testify and falls within a "firmly rooted hearsay exception" does not violate the confrontation clause of the sixth amendment; *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled in part on other grounds by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); we also conclude that the admission of Battle's statements to Foote did not violate the defendant's constitutional right to confront witnesses.

## A

Before discussing the factual and procedural history relevant to the defendant's claim, it will be helpful to the reader for us to set forth some preliminary legal principles regarding the admissibility of hearsay evidence. Under the hearsay rule, "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted"; Conn. Code Evid. § 8-1; generally is inadmissible in court. Conn. Code Evid. § 8-2. The general rule proscribing the admission of hearsay evidence, however, is not absolute. Our code of evidence carves out a number of exceptions to the hearsay rule. One such exception is the "coconspirator exception." This exception provides that a statement that is offered against a party and is "a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy" is not excluded under the hearsay rule. Conn. Code Evid. § 8-3 (1) (D). "[T]he essence

---

that Battle failed to inculpate himself, we would note, as the state does in its brief, that "the claim . . . is immaterial and academic because Battle's out-of-court statements were not admitted under the dual [inculpatory] statement exception to the hearsay rule, and the trial court issued no ruling thereon."

of a conspiracy is an agreement to commit a crime intentionally followed by an overt act in furtherance of that agreement." *State* v. *Smith*, 70 Conn. App. 393, 399–400, 797 A.2d 1190, cert. denied, 261 Conn. 924, 806 A.2d 1063 (2002).

In addition to the restrictions on hearsay evidence set forth under our code of evidence, there are certain instances in which the admission of hearsay evidence may violate a criminal defendant's right, under the sixth amendment to the United States constitution, to confront witnesses. Our Supreme Court has explained that "the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. . . . [A]lthough . . . hearsay rules and the [c]onfrontation [c]lause . . . generally [are] designed to protect similar values, [the United States Supreme Court has] . . . been careful not to equate the [c]onfrontation [c]lause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The [c]onfrontation [c]lause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. . . . [T]he primary interest secured by confrontation is the right of cross-examination." (Citation omitted; internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 347–48, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

With these basic evidentiary and constitutional principles in mind, we will now set forth the relevant factual and procedural background of the defendant's claim. Prior to the start of the trial, the defendant filed a motion for a pretrial evidentiary hearing. In his motion, the defendant asserted that the state planned to have Foote testify as to out-of-court statements made to him by Battle. The defendant argued that Battle's out-of-court

statements did not fall under the coconspirator exception to the hearsay rule and therefore would be inadmissible. The defendant requested an evidentiary hearing in order to resolve the admissibility of any out-of-court statements made by Battle to Foote. On November 6, 2007, the court held a hearing, outside the presence of the jury, to determine whether the statements were admissible. The hearing consisted primarily of testimony by Foote regarding the circumstances surrounding his involvement in the attacks on Hopson. At the conclusion of the hearing, the defendant's trial counsel restated his objection to allowing Foote to testify as to out-of-court statements made by Battle. Defense counsel stated that he believed allowing Foote to testify as to these statements would also violate the defendant's constitutional right to confront witnesses. The court ruled that the state had proven by a "preponderance" of the evidence that Battle was part of a conspiracy to kill Hopson and reserved judgment as to whether Battle's statements were made in furtherance of the conspiracy.

Foote subsequently testified in front of the jury. Prior to the portion of Foote's testimony regarding Battle's involvement in the May, 2003 attempted murder of Hopson, the defendant's trial counsel renewed his objection to any testimony Foote might give regarding out-of-court statements made by Battle. The court noted the objection and allowed Foote to testify.

Foote testified, in relevant part, to the following effect. Following the August, 2002 attack, the defendant told both Foote and Battle that the defendant wanted Hopson to be killed. Battle nodded his head in agreement and said: "[Y]eah, we could do that." Some time later, Foote, along with Battle and the defendant, reconnoitered locations at which to kill Hopson. When the defendant suggested killing Hopson at the mouth of the driveway leading to Hopson's residence, Battle

agreed that it was a "good spot to get him . . . ." Following Santos' May, 2003 attempt on Hopson's life, Battle visited Foote and told him that he had taken Santos to "get" Hopson, that Santos had been caught by the police and that Battle now feared that Santos would "tell on him." Battle asked Foote to get money from the defendant so that he could "leave town."

After Foote testified that Battle had asked him to get money from the defendant, the defendant's trial counsel once again objected to the admission of Battle's out-of-court statements. The court denied the defense's objection and issued the following ruling: "[I]n overruling your objection, I am allowing these statements as an exception to the hearsay rule because I am ruling that it is a statement by a coconspirator, which is an exception to the hearsay rule, and I have found that these are statements, along with others, that are in furtherance of the conspiracy and, therefore, the jury can consider them and, obviously, it is up to the jury to decide what weight they want to give these and whether they were actually said or not; I mean, that is your determination, as with all the evidence, but I have overruled the objection on hearsay grounds and have allowed it under an exception for coconspirator statements made in furtherance of the conspiracy."

### B

We first consider whether Battle's out-of-court statements fell within the coconspirator exception to the hearsay rule. We conclude that these statements did fall within the coconspirator exception.

Looking to the federal courts for guidance, our Supreme Court has adopted standards to permit introduction of statements under the coconspirator exception. "Before such statements may be admitted, the trial judge must make a preliminary determination that there

is sufficient independent evidence to establish the following: (1) that a conspiracy existed . . . (2) that the conspiracy was still in existence at the time the statement was made . . . (3) that the declarations were made in furtherance of the conspiracy . . . and (4) that both the declarant and the defendant participated in the conspiracy . . . . The court must make its preliminary determination by a fair preponderance of the evidence independent of the hearsay utterances . . . a standard which is lower than the standard of evidence required to submit a charge of conspiracy to the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Vessichio*, 197 Conn. 644, 654–55, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

"Proof by a fair preponderance of the evidence is proof by the better evidence, the evidence having the greater weight, the more convincing force in [the fact finder's] mind. . . . The standard of proof of a fact by a fair preponderance has been met when all the evidence considered fairly and impartially evinces a reasonable belief that it is more probable than not that the fact is true. . . .

"In reviewing a claim that the state failed to meet the threshold of proof regarding the existence of a conspiracy with the defendant as a participant to permit evidence of out-of-court statements by coconspirators, we must construe the evidence in a way most favorable to sustaining the preliminary determinations of the trial court; its conclusions will not be disturbed on appeal unless found to be clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Haggood*, 36 Conn. App. 753, 767–68, 653 A.2d 216, cert. denied, 233 Conn. 904, 657 A.2d 644 (1995).

In the present case, following the preliminary hearing, the court ruled only that a conspiracy existed that

included Battle and the defendant and reserved judgment until the defendant testified in front of the jury as to whether the conspiracy still was ongoing at the time that Battle's statements were made and whether those statements were in furtherance of the conspiracy. Thus, our analysis is limited initially to a review of the evidence, excluding Battle's out-of-court statements, only in terms of its sufficiency to sustain the court's preliminary determination, by a preponderance of the evidence, that Battle and the defendant were participating in a conspiracy to kill Hopson when these statements were made.[4] In order to prove a conspiracy at this stage, the state had the burden of showing that the coconspirators "knowingly engaged in a mutual plan to do a forbidden act." *State* v. *Smith*, 36 Conn. App. 483, 486, 651 A.2d 744 (1994), cert. denied, 233 Conn. 910, 659 A.2d 184 (1995). During the hearing, Foote testified that the defendant went to both him and Battle and asked them to kill Hopson. Foote also testified that Battle went with him and the defendant to reconnoiter locations at which to kill Hopson. Further, the prosecutor represented that there were telephone records indicating that Battle was in communication with both Santos and the defendant during the time period surrounding the attack. On the basis of our own review of the evidence, we conclude that the court's preliminary

---

[4] In the section of the defendant's brief addressing the coconspirator hearsay exception, the defendant relies almost exclusively on an argument that the coconspirator hearsay rule was not invoked properly because there was insufficient proof of Foote's participation in the conspiracy to have Hopson killed. Unfortunately, the defendant appears to have misinterpreted our case law to require that the listener who is testifying as to the hearsay of an out-of-court declarant be a part of the conspiracy. This is simply not the case. The listener need not be a member of the conspiracy, and so it is irrelevant whether or not Foote was a coconspirator at the time Battle's statements were made. It is enough that the declarant, Battle, and the nonoffering party, in this case, the defendant, were part of a conspiracy at the time the statements were made and that the statements were made in furtherance of the conspiracy.

determination that Battle and the defendant partici-pated in a conspiracy to kill Hopson was not clearly erroneous.

We next must decide whether (1) the court properly determined that the conspiracy still existed at the time Battle's statements were made and (2) whether Battle's statements were made in furtherance of the conspiracy. See Conn. Code Evid. § 8-3. The initial statements attrib-uted to Battle, in which he agreed to kill Hopson, cer-tainly occurred during and in furtherance of the conspiracy because an essential element of conspiracy is an agreement to do a forbidden act. In regard to Battle's statements expressing concern that Santos would talk to the police and Battle's request that Foote obtain money from the defendant so that Battle could escape, it is well established that "[a] conspiracy does not necessarily end with the commission of the target crime. Thus, a subsequent declaration of a conspirator may be admissible against any coconspirator . . . if the conspirators were still concerned with the conceal-ment of their criminal conduct or their identity . . . ." (Internal quotation marks omitted.) *State* v. *Camacho*, supra, 282 Conn. 355. In sum, we conclude that it was not clearly erroneous for the court to have ruled that the conspiracy existed at the time Battle's statements were made and that Battle's statements were made in furtherance of the conspiracy to murder Hopson. Accordingly, the court properly ruled that Battle's out-of-court statements fell within the coconspirator excep-tion to the hearsay rule.

C

We next consider the defendant's claim that the admission of Battle's out-of-court statements violated his right, under the sixth amendment to the United States constitution, to confront witnesses. We conclude

that the defendant's constitutional rights were not violated.

In *Ohio* v. *Roberts*, supra, 448 U.S. 66, the United States Supreme Court defined the standard for admissibility of hearsay evidence under the confrontation clause as allowing admission of all statements in which (1) the declarant is unavailable to testify and (2) the statement bears "adequate indicia of reliability." The reliability of an out-of-court statement "can be inferred *without more* in a case where the evidence falls within a firmly rooted hearsay exception." (Emphasis added.) Id. Twenty-four years later, in *Crawford* v. *Washington*, 541 U.S. 36, 60–69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the court "refined this standard, overruling *Roberts* for cases in which the state seeks to admit 'testimonial' hearsay statements against a defendant." *State* v. *Camacho*, supra, 282 Conn. 348. The *Crawford* court "held that testimonial hearsay statements may be admitted only when (1) the declarant is unavailable to testify, and (2) the defendant has had a prior opportunity to cross-examine the declarant." Id., 348–49. As our Supreme Court has recognized, the new standard announced in *Crawford* is limited to situations involving the use of *testimonial* hearsay. Therefore, "nontestimonial hearsay statements may still be admitted as evidence against an accused in a criminal trial if [they] satisf[y] both prongs of the *Roberts* test, irrespective of whether the defendant has had a prior opportunity to cross-examine the declarant." (Internal quotation marks omitted.) Id., 349.

The defendant, in his brief submitted to this court, concedes that "[s]ince Battle's statements [were] not testimonial, the *Roberts* test is the proper standard for determining [the] admissibility" of Battle's statements. At a pretrial hearing, the prosecutor indicated that Battle would be unavailable to testify because he planned on asserting his fifth amendment right not to testify,

and the court apparently accepted the prosecutor's representation.[5] On appeal, the defendant has not challenged Battle's unavailability to testify. Thus, following the *Roberts* test, the only question remaining before us is whether Battle's statements fall within a "firmly rooted hearsay exception"; *Ohio* v. *Roberts*, supra, 448 U.S. 66; and are thereby adequately reliable. In the preceding section of this opinion, we concluded that Battle's out-of-court statements were admissible under the coconspirator exception to the hearsay rule. The coconspirator exception to the hearsay rule is "a firmly rooted exception" to the hearsay rule. *State* v. *Camacho*, supra, 282 Conn. 353. Accordingly, we conclude that the defendant's sixth amendment right to confront witnesses was not violated.

## IV

The defendant claims that there was insufficient evidence to sustain the conviction. We disagree.

At the close of evidence, the defendant's trial counsel moved for a judgment of acquittal as to all counts on the basis of insufficient evidence. The court denied the motion. On appeal, the defendant argues that "[a]bsent the improperly admitted hearsay . . . there is startlingly little evidence showing the defendant's involvement with the two conspiracies. This is particularly true regarding [the second conspiracy to kill Hopson]. There is a complete lack of physical evidence tying the defendant to either of the attacks on Hopson. The multilevel hearsay introduced through Foote is neither corroborated, reliable, nor even consistent. Likewise, absent Battle's alleged statements, there is insufficient evidence to sustain any conviction against the defendant."

---

[5] "It long has been the practice that a trial court may rely upon certain representations made to it by attorneys, who are officers of the court and bound to make truthful statements of fact or law to the court." *State* v. *Smith*, 289 Conn. 598, 609, 960 A.2d 993 (2008).

Our standard of review for a claim of insufficiency of the evidence in criminal cases is well settled. "We first construe the evidence in the light most favorable to sustaining the verdict. We then determine whether based on the facts so construed and the inferences reasonably drawn therefrom the finder of fact reasonably could have concluded that the cumulative impact of the evidence established the defendant's guilt beyond a reasonable doubt. . . .

"[Although] the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Thus, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's judgment] of guilty. . . .

"Moreover, as an appellate court, we do not act as a finder of fact capable of rendering judgment on the basis of some feeling of doubt of guilt perceived from the printed record. Instead, we must defer to the finder of fact's evaluation of the credibility of the witnesses that is based on its invaluable firsthand observation of their conduct, demeanor and attitude. . . . [The fact finder] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the

[fact finder's] exclusive province to weigh the conflict-ing evidence and to determine the credibility of wit-nesses. . . . The [fact finder] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon*, 117 Conn. App. 150, 153–54, 978 A.2d 99 (2009).

In regard to the present case, we begin by noting that the defendant's argument that the evidence was insufficient to support the conviction, based on the "complete lack of physical evidence," is of no avail. It is well accepted that, owing to the generally clandestine arrangements underlying most conspiracies, it is com-mon for conspiracy convictions to be based on circum-stantial evidence. See, e.g., *State* v. *Smith*, supra, 36 Conn. App. 486. Beyond this, the majority of the defen-dant's argument is premised on the assumption that Battle's out-of-court statements were inadmissible and that without these statements, there was "startlingly little evidence" showing the defendant's involvement in the two conspiracies. In part II of this opinion, we concluded that Battle's out-of-court statements *were* admissible. Because the defendant's argument largely is based on his erroneous assumption that Battle's out-of-court statements were inadmissible, it would serve little point for us to engage in a lengthy synopsis of the evidence that was presented at trial or a point by point discussion of the elements of each crime. Suffice it to say, on the basis of our review of the evidence, that we conclude that there is a reasonable view of the evidence that supports the jury's verdict of guilty on all counts.

V

The defendant claims that the court improperly denied his motion for disqualification of the judicial

authority and request for a new trial. Because the defendant has failed to challenge one of the grounds relied on by the court to deny his motion, we decline to review this claim.

The following facts and procedural history are relevant to our resolution of the defendant's claim. Following his conviction but prior to the sentencing hearing, the defendant filed a motion to disqualify Judge Clifford, who presided over the trial, and a request for a new trial. On April 15, 2008, the court, *Holzberg, J.*, denied the defendant's motion, concluding both that (1) the defendant waived this claim by failing to raise it in a timely manner and (2) the claim lacked merit. On appeal, the defendant appears only to challenge Judge Holzberg's determination that the defendant's claim for judicial disqualification lacked merit. The defendant either has neglected or chosen not to address Judge Holzberg's determination that he waived his claim that Judge Clifford should have been disqualified. Because the defendant has failed to challenge one of the grounds relied on by the court to deny his motion, we decline to review the defendant's claim. See *State* v. *Howard*, 105 Conn. App. 767, 773, 939 A.2d 638 (2008) (declining to review claim where defendant failed to challenge one of grounds relied on by trial court to exclude evidence); see also *State* v. *Saucier*, 283 Conn. 207, 222–23, 926 A.2d 633 (2007) (claim not raised on appeal deemed abandoned).

## VI

The defendant claims that his trial counsel rendered ineffective assistance of counsel. We decline to review this claim.

During questioning of Foote by the defendant's trial counsel, the following colloquy took place:

"Q. And during that time, did you come to know of . . . the fact that . . . Hopson had a relationship with the mother of Ray Allen, the basketball player?

"A. Know nothing about that.

"Q. Nothing at all, never talked to anybody about that?

"A. Nothing.

"Q. Never talked to anyone about Ray Allen's prominence, prominence of the mother?

"A. Never.

"Q. Nothing like that, you're sure of that?

"A. Positive."

In a posttrial brief regarding a separate issue, the defendant claimed that Allen is a "legendary basketball player from the University of Connecticut and current star of the Boston Celtics" and "is the [stepson] of the victim in this case." On appeal, the defendant claims that Allen is a "local icon" and that being accused of soliciting harm to a loved one related to a local icon can serve only to anger and to embitter a jury. As a result, the defendant claims that the effectiveness of the defendant's case was "to a large extent, hamstrung by his counsel's 'opening the door' by being the first to mention Ray Allen in front of the jury and to identify him as Hopson's stepson."

"Almost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than

by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 687–88, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

The defendant's ineffective assistance of counsel claim rests solely on his trial counsel's decision to discuss Allen in front of the jury. The complete lack of an evidentiary record regarding what impact defense counsel's revealing Allen's connection to Hopson may have had on the outcome of the trial is demonstrative of the inappropriateness of raising an ineffective assistance of counsel claim on direct appeal. Moreover, the defendant has not asserted that his sixth amendment rights were jeopardized by the actions of the court or that this issue presents a question of law. As such, we decline to review the defendant's claim of ineffective assistance of counsel.

The judgment is affirmed.

In this opinion the other judges concurred.